EXHIBIT 4

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3   NETLIST, INC.,              (  CAUSE NO. 2:21-CV-463-JRG
                                 )
 4          Plaintiff,           (
                                 )
 5   vs.                         (
                                 )
 6   SAMSUNG ELECTRONICS CO., LTD., (
     et al.,                     )  MARSHALL, TEXAS
 7                               (  JANUARY 19, 2023
            Defendants.          )  1:30 P.M.
 8   _____

 9

10

11   _____

12                       MOTION HEARING

13          BEFORE THE HONORABLE RODNEY GILSTRAP
             UNITED STATES CHIEF DISTRICT JUDGE

14   _____

15

16

17

18

19

20

21

22            SHAWN McROBERTS, RMR, CRR
                100 E. HOUSTON STREET
23            MARSHALL, TEXAS  75670
                  (903) 923-8546
24         shawn_mcroberts@txed.uscourts.gov

25
```

1                    A P P E A R A N C E S

2          FOR THE PLAINTIFF:    IRELL & MANELLA, LLP -
                                 LOS ANGELES
3                                1800 AVENUE OF THE STARS
                                 SUITE 900
4                                LOS ANGELES, CA 90067-4276
                                 (310) 203-7096
5                                BY:  MR. JASON SHEASBY

6                                McKOOL SMITH, P.C. - MARSHALL
                                 104 E. HOUSTON ST., SUITE 300
7                                MARSHALL, TEXAS  75670
                                 (903) 923-9000
8                                BY: MR. SAMUEL BAXTER

9          FOR THE DEFENDANTS:   FISH & RICHARDSON PC -
                                 WASHINGTON DC
10                               1000 MAINE AVE., SW
                                 SUITE 1000
11                               WASHINGTON, DC 20024
                                 (202) 783-5070
12                               BY:  MR. RUFFIN CORDELL
                                     MS. LAUREN DEGNAN
13
                                 FISH & RICHARDSON, PC -
14                               SAN DIEGO
                                 12860 EL CAMINO REAL
15                               SUITE 400
                                 SAN DIEGO, CA 92130
16                               (858) 678-5070
                                 BY:  DR. FRANCIS ALBERT
17
                                 GILLAM & SMITH, LLP
18                               303 SOUTH WASHINGTON AVENUE
                                 MARSHALL, TEXAS  75670
19                               (903) 934-8450
                                 BY:  MS. MELISSA SMITH
20
           OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
21                               100 E. HOUSTON STREET
                                 MARSHALL, TEXAS  75670
22                               (903) 923-8546

23

24

25

1          THE COURT:  Be seated, please.

2      This is the time set for various pending motions before

3  the Court in the Netlist versus Samsung, et al., matter.  This

4  is Civil Case No. 2:21-CV-463.

5      The Court will call for announcements at this time.

6      What says the Plaintiff Netlist?

7          MR. BAXTER:  Good afternoon, Your Honor.  Sam Baxter

8  from McKool Smith and Jason Sheasby from Irell.  And we are

9  ready, Your Honor.

10          THE COURT:  Thank you.

11      What's the announcement from the Defendants?

12          MS. SMITH:  Good afternoon, Your Honor.  Melissa

13  Smith on behalf of Samsung.  I'm joined by Mr. Ruffin Cordell,

14  Dr. Frank Albert, Ms. Lauren Degnan, and Your Honor we also

15  have a client representative in the courtroom today

16  Mr. Michael Nguyen.  And Your Honor, Samsung's ready to

17  proceed.

18          THE COURT:  All right.  Thank you.

19      I'll note for the record that there are approximately

20  eight motions that have built up on the Court's docket over

21  the last period of time that need to be resolved so the case

22  can be put in a posture to move forward toward its current

23  trial setting in May.  The Court ordered the parties to appear

24  this morning by 9:00 and meet and confer on these various

25  pending motions in an effort to hopefully resolve some, if not

1    all of them, and the parties did appear, they met and

2    conferred here beginning at 9:00 a.m.  I'm advised that three

3    of these matters have been resolved by an agreement of the

4    parties, and I want to get an announcement on the record from

5    the parties as to the substance of those agreements, and then

6    we'll proceed to take up the remaining matters that were not

7    resolved through the parties' meet and confer efforts.

8        I'm happy to hear from either party with the other one

9    confirming the recitation, but who's prepared to give me a

10   recitation on the record as to the three motions that have

11   been resolved?

12           MR. SHEASBY:  With your Court's permission I will do

13   it.  Jason Sheasby.

14           THE COURT:  Why don't you go to the podium and do

15   that, Mr. Sheasby.

16       And Mr. Cordell, I will let you tell me if that's

17   accurate or not.

18           MR. SHEASBY:  So the first one that will be resolved

19   is Docket No. 113, and the resolution on Docket 113 will be

20   that Samsung will have an extra two weeks to add any

21   additional arguments it needs to in its expert reports for the

22   4H HBM products beyond those that are applicable to the 8H HBM

23   products.

24           THE COURT:  Is that correct, Mr. Cordell?

25           MR. CORDELL:  Yes, Your Honor.

1          THE COURT:  All right.  The Court will accept that

2    agreement and order the motion resolved in that manner.

3        I believe the Document No. 124 is next, Mr. Sheasby.

4    What's the agreement there?

5          MR. SHEASBY:  Yes.  So on Document No. 124, the

6    following depositions will be produced from the ITC

7    proceedings--Doctor Lee, C.K. Hong, Gail Sasaki, Mr. Milton,

8    and J.B. Kim.  If Samsung introduces those depositions at

9    trial, Netlist will have the right to counterdesignate.

10          THE COURT:  All right.  What's Defendant say about

11   that recitation?

12          MR. CORDELL:  That's correct, Your Honor.

13          THE COURT:  Okay.  Then I'll accept the parties'

14   agreement and order the agreement carried out as a result of

15   that motion.

16        And I believe Document 125 is also resolved.  Is that

17   correct?

18          MR. SHEASBY:  That's correct, Your Honor.  Samsung

19   has represented that the SSI data that was produced to is end

20   sale SSI data.  For the purposes of doing a cross check on the

21   transfer pricing, they will produce the -- for one DDR4 LRDIMM

22   product, 1 DDR5 product, and one HBM product, the end-sale

23   pricing for two of Taiwan, Shanghai, or EU subsidiaries.

24          THE COURT:  Taiwan, Shanghai, or what?

25          MR. SHEASBY:  EU subsidiaries.

```
 1              THE COURT:  Okay.

 2              MR. SHEASBY:  Based on what's most feasible for

 3    them.

 4              THE COURT:  What's Samsung say to that recitation?

 5              MR. CORDELL:  Mr. Sheasby is almost correct.  I

 6    think it was Singapore rather than Shanghai.

 7              MR. SHEASBY:  Yes, but you -- I thought you said --

 8              MS. DEGNAN:  Mr. Sheasby is correct.  It is Shanghai

 9    and the spreadsheet on Singapore.

10              MR. SHEASBY:  Shanghai.  Okay.

11              THE COURT:  So with some discussion, the original

12    recitation is correct?

13              MR. SHEASBY:  Yes, Your Honor.

14              THE COURT:  I'll accept the parties' resolution and

15    order those agreements carried out.

16         Okay.  That leaves us the balance of what was set

17    unresolved and we'll proceed to take those matters up.

18         Let's begin with Samsung's motion to stay pending IPR

19    review and the Ninth Circuit appeal, and I see no reason why

20    that shouldn't be coupled with Samsung's unopposed motion for

21    leave to file a supplement to the pending motion to stay

22    pending the Ninth Circuit appeal and the IPR review.  I

23    believe this second motion was filed after the institution

24    decision was announced in December, and I'm sure it just

25    relates to that, but these two seem related so we'll hear them
```

1    both at the same time.

2         MR. CORDELL:  Thank you, Your Honor.

3    May I approach?

4         THE COURT:  Please.

5    All right, counsel.  Go ahead.

6         MR. CORDELL:  Thank you, Your Honor.

7    It's Ruffin Cordell on behalf of Samsung, and we are

8    here to ask the Court to stay this matter for two important

9    reasons.  The Ninth Circuit is considering an appeal from a

10   Central District of California case wherein Netlist

11   successfully sought and obtained judgment that the -- an

12   agreement between the two parties, the 2015 JDLA was

13   terminated, and as a result of that termination the license

14   that Samsung enjoyed to all of Netlist's patents, including

15   the patents-in-suit, was terminated.  We believe that that was

16   improper.  We've got an appeal pending.  It's fully briefed.

17   We expect to get an order setting argument any day now, and

18   that it will be resolved in the near future.

19        THE COURT:  Let me ask you this.  Wasn't there an

20   action, a declaratory judgment action filed by Samsung in the

21   District of Delaware that dovetails with this issue in the

22   Central District of California, and you, as I understand it,

23   have not moved the Delaware court to stay that proceeding?

24   What's the interaction of these two matters?

25        MR. CORDELL:  Thank you, Your Honor.

1    We have not moved, but we've made it very clear that if

2    this court stays, we will immediately seek a stay of the

3    Delaware action.  So we believe all actions should be stayed

4    pending resolution by the Ninth Circuit.

5    I'm about to go into the *Landis* factors, but what we're

6    really talking about here is the comety--I have a hard time

7    with that word--between sister courts.  And we believe that

8    the judgment of the Central District of California was

9    incorrect.  We think that that license agreement should

10   remain, we think that it's in tact, and that really there

11   are -- there can be no patent litigation issues in any court

12   because we believe that agreement is in tact.

13   THE COURT:  What's your position on the IPRs?

14   MR. CORDELL:  The IPRs we believe is a second reason

15   for stay.  Four of the six patents are subject now to

16   instituted IPRs.  We will get decisions on the last two on

17   April 19.  We've seen other similar IPRs that cover

18   essentially the same claims and certainly the same issues, and

19   they've not only been instituted, but they have been

20   successful.  We've seen the Patent Office actually invalidate

21   those claims.

22   So we feel like this is a unique case in that we have

23   both the comety considerations of our sister court in

24   California coupled with four of the six instituted IPRs, and

25   we expect the two additional ones, providing the Court with

1    really a real basis to stay this case.

2           THE COURT:  So if I understand it, this case is set

3    for trial on the 1st of May of this year.  These last two

4    institution decisions won't happen until the latter part of

5    April.  If they are instituted on, we're talking about a year

6    from April of '23, which is effectively almost another --

7    almost a year from the trial date that we're looking at now.

8    Is that correct?

9           MR. CORDELL:  That is correct, Your Honor.  There

10   is --

11          THE COURT:  Plus the appeals to the Federal Circuit

12   and all the other related things that will flow from that

13   process.

14          MR. CORDELL:  One of the things that I would like

15   to address at some point is that there is a distinction within

16   the IPRs.  There are really two cases before Your Honor.  One

17   has to do with DDR4 and DDR5 DIMMs--dual inline memory

18   modules; and the other has to do with what are called high

19   bandwidth or HBM products.  They are really two distinct

20   cases.  The original case and the original four patents that

21   we have the instituted IPRs on is really *sui generis*.  We had

22   patents applied to those products alone.  Those have been

23   instituted.

24       The second part of this case, which was filed roughly

25   five months after the original case, relates to two additional

1    patents that Netlist brought on these HBM products.  It's a

2    distinct set of patents.  It's a distinct set of products.

3        So one of the proposals we made was a partial stay; that

4    we stay the first four patents and reserve that for later

5    judgment.  And to the extent the Court feels like we need to

6    proceed now, we can proceed on the HBM products.  And that

7    would drastically simplify the case, it would cut down on the

8    confusion that this jury is going to have to face in keeping

9    these terrible acronyms straight where we have LR4, LR5 DIMM

10   versus HBM products.  And I think it would -- it actually

11   would be a rational way to try the case.  And we do have

12   instituted IPRs on those four, and have had them now for

13   several months.

14           THE COURT:  Well, we had two earlier in 2022 and

15   then the last two were in December of 2022.  Correct?

16           MR. CORDELL:  Correct.

17           THE COURT:  The institutions.

18           MR. CORDELL:  Right.

19       There is a legal issue that we're jostling with between

20   the parties, Your Honor, and it's this.  There are two

21   competing regimes under which courts consider stays.  We point

22   to the *Landis* factors, which is an old Supreme Court case that

23   talks about the interrelationship between sister courts.

24   Netlist, on the other hand, looks at this *Incan* (ph) case

25   which really relates to a stay of an ongoing case when this

1     court makes a decision about its own case; really a stay

2     pending appeal in a single district court.  That, to us at

3     least, is a completely separate line and it's not really

4     appropriate here.

5          What we're talking about here is the *Landis* analysis, and

6     it's been recognized by Your Honor in the *Lochner Techs* case

7     from a few years ago where we're looking at the impact of a

8     sister court's decision on the issues we have to decide.  And

9     it's profound here, because if that license is upheld out in

10    California, there is no lawsuit here, not on any of these

11    patents.

12          THE COURT:  Well, that's my question.  Are you

13    telling me that there's nothing before the Court in this case

14    that's not covered by the JDLA?

15          MR. CORDELL:  Correct.

16          THE COURT:  Okay.

17          MR. CORDELL:  So if we are successful, the JDLA did

18    two things.  Well, it did a number of things, but it set up a

19    joint development between the two parties, but critically, it

20    was a full cross license of all parties' patents.  And I have

21    it here.  I can walk Your Honor through it.  In Section 8 of

22    the JDLA, the parties exchanged a grant to all of their

23    patents and in perpetual licenses.  And you can see it right

24    in the language of the document.  The license is in Section

25    8.2, and it licensed to Samsung all of Netlist's patents for

1    all of Samsung's licensed products.  Licensed products was

2    defined as all semiconductor products manufactured or have

3    manufactured by or for Samsung, excluding foundry products.

4    That's when they're making products for another company, and

5    that's not really at issue here.  That's distinct from the

6    developed product, which was the joint development product

7    that the parties had contemplated.

8        So there's no question that if we win that Ninth Circuit

9    appeal, we are back here with a complete defense, complete

10   defense to all of the claims in this case.

11       Now, in the brief that Netlist filed 10 days ago, 20 days

12   ago, right after the new year, they for the first time said,

13   Well, maybe it doesn't resolve everything; maybe Samsung

14   wasn't really licensed to all of Netlist's patents.  But Your

15   Honor, we don't believe that's true.  So I have --

16           THE COURT:  There's not a dispute about the foundry

17   products as still being live before this Court,

18   notwithstanding what the Ninth Circuit might do?

19           MR. CORDELL:  So I don't think so.  I'll certainly

20   hear from Mr. Sheasby about that, but I think the foundry

21   products are really not accused in this case.  So foundry

22   products is a special class of products where Samsung acts as

23   a manufacturer for some other company as opposed to

24   manufacturing the memory products that are actually accused in

25   this case.  So I don't think it's going to be an issue.

1        And there's just no question that Netlist over and over

2    and over again has announced to the world that 2015 JDLA

3    licensed Samsung.  They told the ITC about it in 2017, they

4    needed to make representations about other parties who were

5    licensed to make these LRD DIMMs or RDIMMs.  And they told the

6    ITC in a submission on the public interest that they had to

7    put -- that, in fact, Samsung had full cross license.

8        They told the Court in California, they told them over

9    and over again, they drew a distinction between the

10   limitations in the JDLA that were confined to the jointly

11   developed products--which is, for example, I have up on slide

12   12 Section 6.2--versus the broad grants out of Section 8 that

13   weren't limited to any particular product.  It was all

14   Samsung's products.  And they relied on that.  They resisted

15   undisputed facts by saying, Well, they will dispute this if it

16   suggests that Samsung was -- that their patent license was

17   somehow limited.  They took the affirmative position that

18   Samsung's license was not limited to any joint research and

19   development product, and that's what the court ruled on.

20       So I have up on slide 14 the Central District's order

21   saying, in fact, holding, in fact, that Section 8's

22   intellectual property licenses were unrestricted to the joint

23   developed product, or it's called the NVDIMM-P development

24   product.

25                  THE COURT:  Can you enlighten me as to why you went

1    forward with your motion to stay here but you didn't go

2    forward with your motion to stay in Delaware?  I know you say

3    if it's granted here you'll immediately move in Delaware, but

4    is there some difference between these two districts that you

5    would move for it here but not move for it there?

6            MR. CORDELL:  Certainly the pace of this litigation

7    is more rapid than what is happening in Delaware, but the

8    short answer is I don't have an answer beyond that.  I haven't

9    thought it through, other than we have committed in writing in

10   our papers to seek a stay immediately if this case is stayed.

11           THE COURT:  All right.  Thank you, counsel.

12       Let me hear a response from Plaintiff, please.

13           MR. SHEASBY:  Madam Courtroom Deputy, could I have

14   the elmo?

15       On October 14th, 2021, the Central District of

16   California granted summary judgment of no license.  The next

17   day Samsung filed a declaratory judgment action in Delaware

18   seeking a declaration that a group of patents were not

19   infringed.  Samsung then attempted to move all the Eastern

20   District of Texas patents into this Delaware action.  Judge

21   Andrews rejected it.  At no point in time was there a

22   discussion of stay.  At no point in time was there a statement

23   that the comety between the Central District of California and

24   Judge Andrews' court was compromised by progressing with the

25   suit.

1        And, indeed, the argument of comety is -- has it

2    backwards, which is comety would argue in favor of this court

3    continuing with this lawsuit because the judge in the Central

4    District of California has twice on the papers rejected the

5    argument that the case that the license actually exists.

6        So that's the first issue I think that definitively

7    resolves the Ninth Circuit issue.

8        There's the second issue which is to say what happens if

9    the Ninth Circuit were to resolve the case and reverse it and

10   send it back to the judge, Judge Scarsi in the Central

11   District of California.  Well, there are sort of two

12   challenges with that which is, one, that still doesn't mean

13   that Samsung has a license--there is just a live dispute as to

14   whether Samsung has the license.

15       Two, for -- there is two levels of dispute regarding what

16   the scope of the license is.  One is my brother pointed out

17   that the license doesn't apply to foundry products, and, of

18   course, I understand that he is going to argue that none of

19   the products at issue are, quote, foundry products.  But that

20   was an affirmative defense that they have the burden on, and I

21   certainly -- I saw no expert report on them establishing that

22   the accused products were non-foundry products or doing any of

23   the technical analysis that was due at the first round of

24   expert reports.  And so it's not clear to me how they would

25   even carry their burden on that issue at this a late stage in

1    time.  In other words, I don't believe that they have the

2    ability to make out a license defense at this point because

3    they haven't done the analysis as to the foundry issue.

4        The third issue is that there is actually one court that

5    has definitively decided the issue of the scope of this cross

6    license, and this is an administrative court in the Republic

7    of Korea.  And the Republic of Korea -- and I put it together

8    so you can see it in context.  The Republic of Korea has

9    definitively rejected any suggestion that this license

10   agreement, the scope of the license extends beyond the joint

11   development projects that they were referencing.  We've

12   analyzed this in our expert reports in order to be in a nexus

13   of caution.  And it wasn't just once--the Republic of Korea

14   has repeatedly found that this license grant is limited.

15       And so even if the Ninth Circuit were to do something,

16   which they are highly unlikely to do, which is to rule *sua*

17   *sponte* that Samsung's license is in place, that would not

18   resolve anything; all it would do is lead to a fight that

19   needs to happen.  And this is the court to have that fight

20   about what the scope is of that cross license.  But like I

21   said, that's impossible because they haven't presented any

22   evidence in their expert reports to support that.

23           THE COURT:  You're saying that the Ninth Circuit,

24   even if they reversed the summary judgment ruling by the

25   Central District of California, the issue would then go back

1    to the trial court to be resolved?

2            MR. SHEASBY:  Yeah.  There would just be a fight

3    about --

4            THE COURT:  On a non-summary basis.

5            MR. SHEASBY:  On a non-summary basis.  There would

6    be three fights.  There would be a fight about whether the

7    license agreement has been terminated properly, there would be

8    a fight about whether the products at issue in this case are

9    foundry products, and there would be a fight in this case as

10   to whether the license granted existed extended beyond the

11   joint development program or during the period of the joint

12   development.  And two of those issues, if they're lodged

13   anyway -- are lodged anywhere, they're lodged before this

14   court definitively.

15           THE COURT:  What's your position on Samsung's

16   request vis-a-vis the IPR?

17           MR. SHEASBY:  Yeah.  So this is something that I

18   struggle with.  There's been a regime change at the PTAB.

19   It's neither bad nor good, but it's objectively obvious, is

20   that Director Vidal has instructed for there to be highly,

21   highly aggressive examination of patents that are in

22   litigation.  And so the challenge is that in an environment in

23   which the frequency of initiation is becoming exceedingly

24   high, in effect, my counsel, my brother counsel is proposing a

25   structure that would have this court stay essentially all its

1    cases while the PTAB rules.

2         There are two conflating factors that I think make this

3    particularly inappropriate.  So this is not a case where it's

4    all about just money damages.  Netlist is an operating entity.

5    Netlist makes products.  They make products which compete with

6    Samsung.  There are products that are not standard essential

7    products at issue in this case.  These are patents that we

8    have never licensed and we've never offered to license just

9    for money.  And so there is a real potential for an injunction

10   to be requested, at least as to some of these products.  And

11   so time is definitely of the essence in this case.  And by the

12   way, I say that with dual --

13        THE COURT:  Slow down, Mr. Sheasby, please.

14        MR. SHEASBY:  I say that with dual recognition of

15   this Court's jaundiced view of the appropriateness of

16   injunctive resolution, but I do think this is a case where at

17   least having this opportunity is important.  It's obviously

18   important to Netlist's business for this to be resolved as

19   soon as possible.

20        The idea of splitting up the cases and doing judicial

21   surgery is not something that's really feasible.  We need to

22   have one trial.  It's highly, highly efficient to split these

23   into two trials.  I note that they told Judge Andrews that all

24   of this plus all of this could all be in front of one trial,

25   and so the suggestion that only a subset of that is unfeasible

1    for a jury I don't think is reasonable.

2         I should also say that there are unique factors on the

3    final two IPRs that I think can make it highly unlikely they

4    will be initiated.  The reason for that is because they were

5    advanced under a construction that was very, very broad.  At

6    Samsung's request, Judge Payne issued a narrow construction

7    based on a disclaimer, and these IPRs are facially defective

8    by not involving that narrow disclaimer.

9         So if you were going to do some type of prudential

10   analysis, you would say it's unlikely that these two IPRs, if

11   they're even initiated, would get resolved.  And as you see,

12   we're talking about late into 2024 before we get to even first

13   instance resolutions.  And, you know, justice delayed is

14   justice denied.

15        With that, Your Honor, I'll rest on the papers.

16             THE COURT:  All right.  We've got a lot of ground to

17   cover, but if you have anything by way of very short rebuttal

18   that's just not pure reiteration, I'm happy to hear it,

19   Mr. Cordell.

20             MR. CORDELL:  Thank you, Your Honor.

21        Can I have slide 15?

22        So let me just address the Korean -- the Korean Tax

23   Authority issued an opinion in a proceeding brought by Netlist

24   to which Samsung was not a party, not privy to, not informed

25   of.  This was all something done within Korea, and the issues

1    there are completely different.  So this court typically

2    doesn't accept statements that are made back and forth in

3    cases even between these parties, and absolutely shouldn't

4    here where we had absolutely no involvement with it

5    whatsoever.

6         As to what would happen if the Ninth Circuit reverses, I

7    take issue with Mr. Sheasby because it's not a case where we

8    have to go back and prove entitlement to the license.  If the

9    Ninth Circuit reverses, the license is restored.  We are back

10   licensed to these patents.  And that has two impacts.  The

11   substantive impact, because now we have a defense to all his

12   infringement claims --

13            THE COURT:  Well, let me stop you.  Are you telling

14   me that somehow you're privy to what the Ninth Circuit's

15   opinion is going to say?  I've read a lot of appellate

16   decision that told me to do things I didn't anticipate they

17   were going to tell me to do.  I mean, clearly they could

18   affirm, they can reverse and remand, or they can reverse and

19   render.  If they don't reverse and render, then I don't think

20   you immediately have the golden key of a license that you can

21   run to the Court with.

22            MR. CORDELL:  Well, they could vacate.  They could

23   vacate and remand.  That's certainly a possibility.

24            THE COURT:  And give instructions to proceed

25   consistent with our opinion above, which then the poor judge

1    in California's got figure out what the heck that means.

2         MR. CORDELL:  Well, and certainly there are

3    permutations that wouldn't be in my favor.  I could lose.  And

4    if I lose, well, then I have no license.  But if they do any

5    of the other options, if they merely vacate, we are now

6    restored to the status ante, and we would go back and be in

7    possession of the license that we were in before the judgment

8    was entered.

9         THE COURT:  Well --

10        MR. CORDELL:  That means that -- that has two

11   impacts, Your Honor.  It has a substantive impact on

12   liability, but also a temporal impact, because suddenly that

13   period of damages is wiped out because the license is

14   restored.  So it is an important, you know, effect and not

15   anything that I necessarily have to go back and improve.  I

16   think it's just the opposite.  I think the most likely outcome

17   is either I'm going to lose, or I'm going to win and the

18   license is restored and all of the work we're doing here is

19   for naught.

20        THE COURT:  Well, the problem is it's all based on

21   what you think might happen.  We just don't know.

22        MR. CORDELL:  Well, that's true.  But in these cases

23   the *Landis* factors counsel that we are to allow the sister

24   court to proceed to judgment and then we can proceed, you

25   know, in a rational and orderly basis.

 1                THE COURT:  What else do you want to tell me?

 2                MR. CORDELL:  So as to the IPRs we moved very

 3      quickly to get these IPRs on file.

 4           Can I have slide 32?

 5           We filed our IPRs on two of the patents before answering

 6      the complaint, and then within two weeks of receiving

 7      infringement contentions on the two others.  They waited three

 8      and a half months to assert the last two patents, and then

 9      we -- well, no, I'm sorry.  They waited five and a half months

10      to assert the last two patents, and we moved within three and

11      a half months of getting those for the first time.  So we

12      moved very expeditiously.

13           And the notion that Netlist is going to ask for an

14      injunction doesn't really hold up because they didn't even

15      put it in their complaint.  Their complaint doesn't request

16      injunctive relief.  There's no prayer for injunctions.  It's

17      -- this is simply not an injunction case.  And even if they

18      had, it is not true that they haven't licensed these patents;

19      they licensed them to us.  I took you through Section 8 of the

20      JDLA.  And the reality is that -- I think Mr. Sheasby was

21      correct.  I wouldn't have characterized it with the word

22      'jaundiced', but I think that is correct that injunctions are

23      rarely granted today in patent cases.

24           Thank you.

25                THE COURT:  Well, that's probably more the result of

1    the Supreme Court's *eBay* decision than any particular court's

2    jaundice or lack of jaundice.  But anyway, I think it's a fair

3    characterization of the landscape.

4        All right.  Thank you.

5            MR. CORDELL:  Thank you, Your Honor.

6            THE COURT:  All right.  Let's take up next Document

7    121, which is the Plaintiff's motion to compel the deposition

8    of J.B. Lee.

9        Let me hear from Netlist on this.  I think I understand

10   most of the background here, Mr. Sheasby, who this gentleman

11   is, what his role was previously, what his role is now as the

12   president and general manager of the Samsung memory business.

13           MR. SHEASBY:  So let me then just update you on the

14   sort of the bidding and the ask, is the central problem that

15   we have is this is an individual who was on a series of emails

16   and correspondence in which he's the only person who's been

17   designated as having knowledge regarding these particular

18   issues.

19       So, in particular, there was an exchange of term

20   sheets--this is an agreement that was never reached between

21   the parties--in which he is alone on it.  And there is -- if

22   you see on the right-hand corner, it talks about using an NRE

23   as a way to cast payments that would otherwise be described as

24   royalty payments.  And this document is actually an area of

25   central dispute.  The dispute is that Netlist witnesses have

1    testified that this was J.B. Lee's request to have the

2    agreement structured this way.  Samsung obviously vigorously

3    disputes that.  And so what we offered to them is, If you're

4    not going to let us examine J.B. Lee on documents where he has

5    unique knowledge, then you shouldn't be able to use the

6    documents and introduce them into evidence and use them

7    against us.

8        And this is one example of it, and then the other central

9    example of it is I think a very, very important one.  This is

10   an email exchange between --

11       THE COURT:  Well, let me just say this.  I'm not

12   going to consider a rule on what's going to be admissible and

13   what's not going to be admissible at trial today.  I'm

14   interested in deciding whether this individual is going to be

15   shielded or not shielded from deposition.  And whatever the

16   answer to that is, I'll take up whatever the impact that might

17   be on exhibits later.  But tell me why he should not be

18   shielded under the apex doctrine.  And am I correct that the

19   Central District of California did shield him even though he

20   was a mere vice president at the time?

21       MR. SHEASBY:  They shielded him, but it was a

22   magistrate decision that was with leave to approach, and we

23   ultimately did not need him for that case.  In this issue

24   there are these two central issues.

25       And I want to come back to it.  This document they are

1   going use to say that we told Samsung pay us an NRE and it

2   will be used -- it will be a surreptitious royalty.  I know

3   this because they talked about it to our CEO for about an

4   hour.

5          The person who received this document, the only person

6   who received this document was J.B. Lee, and the idea that

7   they're going to get to put this document in front of a jury

8   and tell them a story about Samsung -- about Netlist acting

9   surreptitiously or suggesting something surreptitious to

10  Netlist, if we can't examine the only recipient of this

11  document, that goes beyond sort of the apex doctrine and

12  inconveniencing the witness; that goes to a due process issue.

13  And their only response to that is, You can depose someone

14  named Hyun Ki Ji.  Hyun Ki Ji was already disposed in the

15  Central District of California case.  He denied having any

16  knowledge of this whatsoever.

17         And so the reason why I brought this up about

18  admissibility is to show that we've been operating in good

19  faith.  We said, Listen, if you're not going to let the guy be

20  deposed, you shouldn't be able to use the document that he's

21  the unique recipient of, and they declined that offer.  And so

22  from a due process standpoint it cannot be both ways.  If a

23  document which he's sole recipient of that they've told us

24  will be a central aspect of this case is going to be used, he

25  needs to be examined on it.

1          THE COURT:  Are you telling me that this document is

2     the only matter he needs to be examined on?

3          MR. SHEASBY:  It's this document, and I'll show you

4     the other one, Your Honor.

5          THE COURT:  Tell me this.  I gather Mr. Lee is -- or

6     Doctor Lee is located in Korea?

7          MR. SHEASBY:  Yes, Your Honor.  We offered to do it

8     by Zoom.

9          THE COURT:  Have you-all explored a Zoom or virtual

10    deposition?  Have you talked about whether it needs to be one

11    hour or two hours, not six or seven hours?  Have you-all tried

12    to find some accommodation back and forth where you both give

13    and take on this?

14         MR. SHEASBY:  We did, Your Honor.  I proposed Zoom

15    for no more than four hours.

16         THE COURT:  Okay.

17         MR. SHEASBY:  And this is the other email I want to

18    talk to you about.  So there was actually someone above J.B.

19    Lee at the time.  His name was J.S. Choi.  And J.S. Choi asked

20    J.B. Lee to investigate the Samsung/Netlist relationship and

21    make sure there is no contamination.  And then J.B. Lee says,

22    I will assess the situation.  And we believe that this

23    contamination is about the potential for them to use our

24    technology in their products, and the reason why we think that

25    is the case is this is from 2016 of June.  And earlier in that

1    year, J.B. Lee was the recipient of a number of products from

2    us that were sent for reverse engineering at Samsung.  The

3    witnesses in this case deny having any knowledge, so we

4    deposed Indong Kim.  He has no knowledge of what they did with

5    the products.  The only person who has knowledge of what

6    occurred with the products is J.B. Lee.

7            THE COURT:  So are you telling me that Doctor Lee

8    was a recipient on these, we'll say two emails, and he never

9    forwarded them to anybody else, nobody else ever discussed

10   them, that he is the sole and only human on the planet that

11   knows anything about that?

12           MR. SHEASBY:  We have no answer to the question of

13   what was done with the DIMMs that they received from us.  We

14   asked Indong Kim and he said, I don't know.  We have no

15   evidence that this document was ever forwarded to anyone else

16   at Samsung.  There is no record of it in the case of it being

17   forwarded to anyone else.  In this email chain in which J.S.

18   Choi says, I will investigate -- I'm instructing you to

19   investigate what's going on, we have no evidence of what

20   happened.  We spoke to Indong Kim about it, who is on the

21   email chain that I just showed about investigating

22   contamination.  "Both J.S. Choi and my boss J.B. Lee are quite

23   concerned."  Indong Kim testified that he has no recollection

24   of what that meant.

25           So it is not a situation in which there's anyone else.

1   This document in particular, we have seen no other forwarding

2   of this document to any other Samsung employee, and the

3   Samsung employee they put up on the subject who they say has

4   knowledge of this subject admitted under oath in his previous

5   deposition he has no recollection of it.  And so --

6           THE COURT:  Answer this for me.  The Court has some

7   concern that if I open this Pandora's box, Doctor Lee is going

8   to tell you something you didn't know and then you're going to

9   come back to me and, Now that we know this we have to go

10  depose this person, and we have to go down this rabbit trail.

11  I mean, fact discovery's already closed, we have a trial day

12  in May --

13          MR. SHEASBY:  Yes, Your Honor.

14          THE COURT:  -- time is fast slipping away from us.

15      How can I be assured that this is not just the proverbial

16  genie getting out of the bottle if I give you some leave to

17  pursue some type of limited deposition here?

18          MR. SHEASBY:  My daughters call it the give a mouse

19  a cookie problem.

20          THE COURT:  Well, whoever calls it what, I think you

21  understand my question.

22          MR. SHEASBY:  Yes.  And the answer is that you just

23  have my word that it will begin and end here with this

24  deposition.

25          THE COURT:  Okay.  Let me hear from Samsung.

1      Mr. Cordell, in the briefing Mr. Sheasby tells me that

2  there are 233 different subsidiaries or divisions of Samsung

3  that have presidents, and President Lee is just one of 233

4  presidents within this global behemoth of a company, so he's

5  not the CEO and this is not an apex situation.  What's your

6  response to that?

7            MR. CORDELL:  Well, I think that Mr. Sheasby's

8  counting is a little off in that he's looking at a worldwide

9  conglomerate that involves subsidiaries that are in, you

10 know -- we heard earlier about I got confused between Samsung

11 Singapore and Samsung Shanghai.  Those are much smaller

12 entities.  What we have with Doctor Lee here is the fact that

13 he is the president and general manager of the entirety of the

14 Samsung memory business.  It's an enormous business that

15 provide between -- I guess it's 40 percent of the DRAM

16 products and 30 percent of the NAND products, the EPROM

17 products worldwide for the entire planet.  He's in charge of

18 over 30,000 employees.  He has employees in 33 offices across

19 the world.  It is really beyond question that he is an apex

20 witness.

21            THE COURT:  What's your response to the argument

22 that as to these targeted emails he's the only person in the

23 world that knows about them?

24            MR. CORDELL:  It's simply not true.  It's simply not

25 true.

1          THE COURT:  Then why haven't you put up somebody who

2     does know about them and who can be deposed on them?

3          MR. CORDELL:  We did.  So, for example --

4     Can I have slide 15?

5          We were talking about a Netlist meeting in April of 2015.

6     And there's some confusion between April 2015 and 2014, but

7     the fact is that the meeting that he was targeting here,

8     President Lee says in his declaration was attended by Indong

9     Kim.  So the gentleman that they did depose that they decided

10    -- that they didn't ask any questions of about this specific

11    meeting, they had a chance to depose him, they did depose him,

12    and they simply didn't ask any questions.  There is no

13    evidence, no evidence that President Lee is the only person

14    that knows anything about these documents; absolutely zero

15    evidence.

16         And if we can have slide --

17         THE COURT:  You understand there could be a meeting

18    that Mr. Baxter and I both went to, and he paid very close

19    attention and I stared out the window, and then after the fact

20    I might remember nothing about it if deposed but he might

21    remember a great detail about it if he was deposed.  Just

22    because there are more than one person that knows about these

23    emails, that's not a real strong indicator of who today

24    possesses the information the other side's entitled to learn

25    about and develop in discovery.

1          MR. CORDELL:  That is true, Your Honor, but that's

2     why we have the apex doctrine, and the apex doctrine tells us

3     what we are to do in these cases.  We are to exhaust

4     alternative sources of the information first, and if those

5     fail then we are to proceed to the apex witness.  So we could

6     depose Mr. Baxter first before we ever approached Your Honor

7     to see what information he has, and that's exactly what --

8          THE COURT:  So did I misunderstand Mr. Sheasby when

9     he told me that, We've deposed other people and they say they

10     don't know anything about this?

11          MR. CORDELL:  I believe he is incorrect.  I don't

12     think they have asked those questions.  There are two

13     principal witnesses at play here.  There's Mr. Indong Kim and

14     then there's Mr. Hyun Ki Ji.

15          THE COURT:  Has Mr. Indong Kim been deposed on these

16     topics?

17          MR. CORDELL:  He was deposed, and we designated him

18     as our 30(b)(6) witness on the key elements of the JDLA and

19     they didn't question him about these things.

20          With respect to EVPG, who is a very high-ranking official

21     within Samsung, very high ranking, we had arranged his

22     deposition, we flew him to the United States, he spent some

23     time in my office, and the day before his deposition, hours

24     before his deposition, we got a unilateral email from Netlist

25     canceling the deposition.

1          THE COURT:  Wait a minute.  Who is EVPG?  Is that a

2     person?

3          MR. CORDELL:  It's really -- it's confusing because

4     -- when I first heard it, I thought it was just a string of

5     initials.  His last name is JI, but it's pronounced G.  So

6     he's executive vice president Hyun Ki Ji.

7          And if I could have beginning at slide -- let me start at

8     slide 9.

9          THE COURT:  So Mr. Kim, Indong Kim has been deposed.

10         MR. CORDELL:  He was.

11         THE COURT:  Mr. Ji was not deposed.

12         MR. CORDELL:  He was not deposed.  And they knew --

13    well, they knew quite directly that Mr. JI was directly

14    involved with the entirety of the facts that they're seeking

15    here.  So we have --

16         THE COURT:  Tell me why Mr. Ji was not deposed.

17         MR. CORDELL:  Again, Your Honor, we brought him over

18    here.  We flew him from Korea, a very busy man, a very

19    high-ranking official.

20         THE COURT:  I heard that.  Why wasn't he deposed?

21         MR. CORDELL:  Because at roughly noon the day before

22    his deposition, we got an email from Netlist canceling the

23    deposition.  Only they can explain to us why they chose not

24    to.

25         And there's no question that he was deeply involved, in

1   fact, I would argue central, to the entirety of what they have

2   shown Your Honor.  So, for example, we have paragraph 7 of

3   President Lee's declaration where he says, I am a high-ranking

4   official.  I don't do these things without a team.  I always

5   involve my team.  It was my practice to share any information

6   I received from Netlist, following any meetings or discussions

7   with other Samsung employees on the relevant teams.  And

8   that's kind of what I expect.  A man that is overseeing 30,000

9   employees and all of these operations doesn't operate solo; he

10  oversees things, he hears, he gives his opinions, but he is

11  not the prime mover on anything.

12      We have the deposition of Mr. Hong at slide 10 talking

13  about this meeting in 2014, this initial exchange of the

14  proposals.  And Mr. Hong -- this is CEO of Netlist Mr. Hong.

15  Mr. Hong testifies that he visited Samsung and met with the

16  president of the memory business unit as well as Jung Bae

17  Lee--that is President Lee--and Hyun Ki Ji.  So EVPG was in

18  that meeting and a whole bunch of other executives, but the

19  CEO of Netlist recalls Mr. Ji being there, EVPG being in the

20  meeting, and yet they chose not to depose him.

21      We have lots and lots of evidence that Mr. Ji was central

22  to the whole thing.  At slide 11.

23          THE COURT:  Have you offered to put up Mr. Ji again,

24  notwithstanding their earlier cancellation of the deposition?

25          MR. CORDELL:  What -- we did talk about that and

1    what we were told is that they're not interested; they know

2    what he's going to say and they're not interested in what he

3    has to say.  So I -- we would be happy to substitute.  I mean,

4    again, it's a little intrusive because we did haul him over

5    here, but if that resolves the problem then I'm sure we could

6    do that.

7             THE COURT:  Tell me why Doctor Lee, as busy and as

8    important as he is, can't take two hours to sit in front of a

9    computer screen with a camera and be remotely deposed for two

10   hours out of one day on this topic.

11            MR. CORDELL:  It is very difficult, Your Honor,

12   because we -- he's a high ranking official, he certainly will

13   do things --

14            THE COURT:  My question assumes all those facts.

15            MR. CORDELL:  But my point is that he's very careful

16   about sworn testimony.  We will have to prepare him

17   extensively.  We will have to involve a number of his

18   subordinates.  It's a herculean effort I guess is the way I

19   would put it.

20       So if we can find a way to get that information through

21   another source, that is what the apex doctrine tells us over

22   and over again that that's how we are to obtain this

23   information.

24       If -- you know, if EVPG could sit for a deposition, I

25   think that would be a way out of the box.  We could answer an

1    interrogatory.  They didn't give us an interrogatory on this,

2    for example.  That would be an alternative source of

3    information to obtain what it is that they're interested in.

4    But burdening this apex executive is the last resort and not

5    the first resort.

6         And if Your Honor can just briefly indulge me, at slide

7    11 we have Mr. Ji sending the term sheet for the

8    Netlist/Samsung agreement.  We have -- I'm sorry.  That was

9    from Jibum Kim, who is a Netlist employee sending it to

10   Samsung, and he sends it to a variety of people but including

11   Mr. Ji.

12        At slide 12 we have an exchange between Samsung and

13   Netlist, but again Mr. Ji, EVPG, is copied again.

14        At slide 13 we have the same situation coming back from

15   Netlist and Jibum Kim of Netlist addresses Mr. Ji.

16        Over and over and over again we see that Mr. Ji was

17   central to these facts, would have the information that

18   presumably Netlist wants or needs, and yet they chose not to

19   depose him.

20        At slide 14 we reproduced the email, Your Honor.  You can

21   see when it was that they called off the deposition.  And I

22   believe that I -- I'm not sure whether 12:51 p.m. was central

23   or eastern time, but I recall it being in the afternoon when

24   we got the email canceling the deposition.

25             THE COURT:  All right.  I'd like to ask a couple of

1    questions of Mr. Sheasby.

2            MR. CORDELL:  Okay.

3            THE COURT:  Mr. Sheasby, I want to know why you

4    didn't depose Mr. Ji.  And Mr. Cordell tells me you -- there

5    was some indication that you didn't depose him because, quote,

6    you already knew what he was going to say.  Did you know what

7    he was going to say?  And if so, how in the world did you know

8    what he was going to say, and why did you not depose him?

9            MR. SHEASBY:  I don't think this was intentional on

10   Mr. Cordell's part, which is he was deposed in the Central

11   District of California case and asked this exact topic about

12   this April 2015 meeting, which is the meeting we care about,

13   and this relates to this controversial term sheet.  It says

14   April 2014, but that's a typo.  It was April 2015.  This is

15   the document, this controversial term sheet --

16           THE COURT:  Go back to his deposition from the

17   Central District of California.  Show me what he was asked and

18   what he said about --

19           MR. SHEASBY:  "Do you recognize an email chain from

20   April 13" --

21           THE COURT:  Can you enlarge that so I can read it on

22   the screen?

23           MR. SHEASBY:  Yes, sir.  It starts on page 27 and

24   goes over to page 28.

25           THE COURT:  What line on page 27?

1            MR. SHEASBY:  27, line 7.

2            THE COURT:  All right.

3            MR. SHEASBY:  And I can move to page 28 when you're

4    ready, Your Honor.

5            THE COURT:  Can you show me the top of 28 so I can

6    follow the dialogue?

7            MR. SHEASBY:  And then we asked Mr. Indong Kim,

8    who's the person who's referenced in J.B. Lee's declaration,

9    whether he was involved in the negotiation at all, and he

10   denied it, that he was involved in any decision-making that

11   led to the negotiation.  This is Indong Kim, the other person

12   they reference.

13       And so there's --

14           THE COURT:  Is this a transcript of testimony or is

15   this a deposition?

16           MR. SHEASBY:  This is a deposition, Your Honor.

17           THE COURT:  This was taken in the California case?

18           MR. SHEASBY:  No, it was taken in this case, Your

19   Honor.

20           THE COURT:  Okay.  What of what you have on the

21   screen are you pointing out is relevant to this issue?

22           MR. SHEASBY:  The highlighting, "Were you involved

23   in the decision-making that led to the execution of the joint

24   development agreement?"  That's the agreement that ultimately

25   came out of all these term sheets that they intend to use at

1    trial.

2         And he said, "No.  I was the person executing the joint

3    agreement."

4         "How do you know about the involvement?"

5         And he said, "I heard afterwards."  So it's just hearsay.

6    So he's --

7              THE COURT:  So his answer was, "No, I wasn't

8    involved; I just signed the document"?

9              MR. SHEASBY:  By executing the joint development

10   agreement, he doesn't mean signing the joint development

11   agreement; he means participating in the joint development

12   after it was executed.  So it's a translation.  It's from

13   Korean to English.  So he did not sign the agreement.

14        To be clear, we're not asking for J.B. Lee because he

15   signed the agreement; we're asking for J.B. Lee because they

16   intend to make this exhibit front and center in the trial,

17   and the person who received it was J.B. Lee.  The person who

18   requested it was J.B. Lee, and the person they're pointing to,

19   Hyun Ki Ji, testified he had no recollection or memory of this

20   conversation, and Indong Kim testified he had no recollection

21   or memory of this subject.

22        And it's the same way with this, with them talking about

23   -- same way with this talking about no contamination between

24   Samsung and Netlist after receiving our products -- after J.B.

25   Lee received our products in about -- investigating what was

1    going on.  There's no other person who has any knowledge of

2    that, and Indong Kim denied having any knowledge of that.  "I

3    will assess the situation."

4        So now he's a really important person.  At the time he

5    was a subordinate of someone else, and he was intimately

6    involved in this process when he was subordinate.  So I don't

7    know what to do.

8        So going back to this, which is to say that I will be

9    very --

10           THE COURT:  Let me ask you this.  Who was his

11   superior at the time?

12           MR. SHEASBY:  J.S. Choi.

13           THE COURT:  And what's the status of Mr. Choi today?

14           MR. SHEASBY:  He's very high up as well.  He's just

15   not as high up as J.B. Lee.

16           THE COURT:  So there's been no discussion of taking

17   Mr. Choi's deposition.

18           MR. SHEASBY:  There hasn't, and the reason for that

19   is because Mr. Choi was not involved in the negotiation in --

20   it's indisputable that Mr. Choi was not involved in the

21   negotiation in 2004.  This was -- there's two separate issues.

22   There's a instruction in April of 2015 where J.B. Lee did it

23   on his own with J.B. Kim, and Mr. Ji has no recollection of

24   it.  And then there's -- after the agreement has been signed,

25   there's this relationship in which they receive our products

1    and they talk about contamination.

2        J.S. Choi was the head of sales at that time.  SVP Lee

3    was the head of planning, which is sort of the design and

4    development arm of Samsung Memory, and he received our

5    products and then something was done with them and that led

6    to this communication regarding contamination.

7        So it was -- it was not trying to be -- you know, I think

8    sometimes people do this and they just do it to be vexatious

9    or opportunistic about it, and that's why I was saying -- we

10   asked them, Just tell us you're not going to use this document

11   and then he no longer becomes a person with unique knowledge.

12   And they said, No, we want to use this document against you,

13   but we're going to block the examination of the sole recipient

14   of this document.  And from a due process standpoint that's

15   just not the way it works.

16       And so I brought that up not for you to rule on an

17   evidentiary issue, but to emphasize that this is not me being

18   vexatious; that there was a serious due process issue here.

19   Doctor Ji testified under oath he doesn't have a recollection

20   of this April 2014 time period.  Indong Kim testified he was

21   not involved in the negotiation.  The nexus and the source is

22   him.

23       And I will note that that declaration that says Indong

24   Kim was involved in the meeting is inconsistent with Indong

25   Kim's own testimony, which was that he was not involved.  And

1    so that, in my mind, calls into question the precision of that

2    declaration.  I don't think J.B. Lee is making things up; I

3    just -- it's clear that I'm not sure he even knows what was

4    going on.  And I think if he was shown documents, there would

5    be a potential to refresh his recollection.

6         So this in particular is a huge problem for me if I don't

7    get to depose this witness.

8              THE COURT:  I hear you.

9              MR. SHEASBY:  Thank you, Your Honor.

10             THE COURT:  Mr. Cordell, does Doctor Lee speak

11   fluent English, or if he were deposed, hypothetically,

12   would this have to be through a translator?

13             MR. CORDELL:  I believe so, yes, Your Honor.

14             THE COURT:  You believe so what?

15             MR. CORDELL:  I believe he would require a

16   translator.

17             THE COURT:  Okay.

18             MR. CORDELL:  If I could just address Mr. Sheasby's

19   arguments.

20        So we've heard a lot about the -- this term sheet, which

21   is misdated.  Instead of April 2014, it's really 2015.  There

22   is no question, there is no question that the meeting here

23   that he's referencing was attended by Indong Kim.  There's no

24   question about that.

25             THE COURT:  But Mr. Kim doesn't say he remembers

1    anything about it.

2           MR. CORDELL:  If you study the testimony that

3    Mr. Sheasby just showed us, that's not what he said.  He

4    said he didn't have a decision -- I'm paraphrasing.  He did

5    not reach the decision to sign the agreement.  He was not part

6    of that decision-making process.  It says nothing about

7    whether or not he attended this meeting.  So we have to be

8    really precise about the statements that we're quoting and

9    make sure that they line up with the issues that are being

10   prosecuted.

11          They did not ask Indong Kim anything, anything about this

12   term sheet.  They did not depose -- the testimony we saw from

13   Mr. Ji had to do with his recollection of who attended the

14   meeting.  If you -- again, if you read the testimony very

15   precisely, he didn't say anything about this term sheet.  They

16   didn't put this term sheet in front of him.

17          THE COURT:  How are you supposed to have a

18   recollection of a term sheet that was developed in a meeting

19   you say you don't remember anything about?

20          MR. CORDELL:  Because when you see the term sheet,

21   it may refresh your recollection.  And we didn't get that

22   opportunity because they didn't do it in the CDCAL case

23   because it wasn't an issue, and then they decided not to

24   depose him in this case.  And the apex doctrine tells us we're

25   supposed to exhaust these other avenues.  They should have

 1    deposed EVPG, who is a very high official, and they chose not

 2    to.  They should have shown him this document that Mr. Sheasby

 3    tells us is critical that he must have examination on, and yet

 4    he chose not to.  They didn't show it to Indong Kim and ask

 5    him what his recollections were or what the background was.

 6    What I understand Mr. Sheasby is interested in is the context

 7    of this term sheet.

 8        So this is really a problem of their own making.  Had

 9    they deposed EVPG, at least it's my opinion that they would

10    have been more than satisfied with the information he could

11    have provided.  I did spend some time with him and he seemed

12    very knowledgeable.  Again, I didn't -- I don't recall whether

13    we covered this exact document or not, but he is a very

14    capable fellow and they should have deposed him.

15            THE COURT:  Maybe I'm confused, and that's certainly

16    a possibility, but didn't I just hear from opposing counsel

17    that in the Central District of California litigation that

18    Mr. Ji was deposed and didn't really have any knowledge of

19    these events?

20            MR. CORDELL:  He was deposed, Your Honor, but --

21    maybe the testimony is still here.  We have to be very precise

22    about what it is that he said.

23            THE COURT:  Well, it's been a while since I took a

24    deposition, but as I recall if you start out with a high-level

25    Were you at this meeting and do you have any recollection and

1    the answer is no, it's not unreasonable to stop there.  What

2    you're telling me is they should have put term sheets from a

3    meeting in front of him after he said he didn't remember being

4    there and ask him about the terms of the term sheet, and that

5    that was a failure to fully exhaust their pre-apex remedies.

6    I don't know that it's unreasonable to not go further when the

7    witness doesn't profess any recollection of the meeting or

8    events that lead up to the term sheet that's the focus of it.

9             MR. CORDELL:  Let me just make sure we're really

10   precise about the testimony here, Your Honor, because this

11   is obviously very important.  So this is the testimony

12   that --

13            THE COURT:  I read all that.

14            MR. CORDELL:  Mr. Sheasby showed us, "Did you attend

15   such a call or meeting with Mr. Kim of Netlist in or around

16   this time?"

17       Answer:  "I don't recall for sure.  However, I think I

18   probably did."

19       Now, a good lawyer would probably want to explore that.

20       Question:  "If you recall, who else attended that meeting

21   with you?"

22       Answer:  "I don't really recall."

23       "Do you recall whether this meeting was in person or by

24   video conference or telephone or in some other fashion?"

25       Answer:  "I don't really remember.  However, it was not a

1    video conferencing, so I think probably face-to-face."

2          THE COURT:  Next question, "Do you remember anything

3    about what was discussed?"

4       "No, I don't remember."

5          MR. CORDELL:  But the point is he did have a

6    recollection of the meeting, and it would have been more

7    than reasonable, then, to show him this document that

8    Mr. Sheasby says is critical and find out, because we just

9    don't know?

10         THE COURT:  Okay.  Anything further on this?

11         MR. CORDELL:  Only that we're happy to explore other

12   avenues, Your Honor.  Again --

13         THE COURT:  You-all had three hours this morning to

14   explore more avenues and you brought me this as an impasse

15   issue you couldn't resolve, so I gather the exploration

16   process has run its course.

17         MR. CORDELL:  It has.  But again, the burden under

18   the apex doctrine is for us to explore whatever avenues are

19   available.  And if Mr. Sheasby is so critically worried about

20   the background of this document, that seems appropriate for a

21   well-targeted interrogatory or set of questions that could

22   solve whatever problems he has.

23         THE COURT:  Okay.  Thank you, counsel.

24      All right.  I next want to move on and take up Document

25   126 and 130.  I think these go hand in glove and there's no

1  reason not to argue them concurrently.  This is the opposed

2  motion to strike Netlist's late disclosure of Netlist products

3  as well as the motion for leave to amend infringement

4  contentions.

5       It seems to me the gravamen of these two matters is

6  Samsung's complaints about not being given adequate notice or

7  the other party not complying adequately with the Court's

8  local rules on disclosures, so I think the appropriate place

9  to start is with Samsung, and I'll hear from Samsung first on

10  these.

11       DR. ALBERT:  Thank you, Your Honor.  Frank Albert

12  for Samsung.

13       We're actually not going to use these slides.  Thank you.

14       So the issue here, Your Honor, is whether it's reasonable

15  for Netlist to disclose at the end of fact discovery embodying

16  products, conception reduction to practice documents,

17  disclosures to third parties that the local rules require that

18  they disclose before discovery even begins.  Your Honor is

19  well aware of the local rules, I don't need to rehash them

20  here, but we're relying on three provisions of Local Rule 3-1

21  and 3-2, 3-1(f) requires that if a party like Netlist wants to

22  preserve the right to rely on the assertion that its own

23  products practice any of the asserted claims for any purpose,

24  then it must disclose that at the beginning of the case and at

25  the infringement contention stage.

1          Similarly, Local Rule 3-2 requires that they -- Netlist

2     disclose the conception reduction practice documents for its

3     asserted patents.  3-2 also requires that Netlist disclose

4     documents evidencing disclosures to third parties, so the

5     subject matter of the patents of the invention, before the

6     application for the patents at issue here.  Netlist did none

7     of that.  Instead, it waited until the end of discovery to

8     disclose tens of thousands of pages of documents regarding

9     these issues, as well as an allegation that six of their

10    products practice the asserted patents.

11         And the facts here, Your Honor, are pretty telling.

12    Here you have a case that was filed December of 2021.  They

13    chose this forum.  Counsel for Netlist described earlier about

14    the dispute the parties had about whether this case should be

15    in Delaware or here in East Texas.  We are here after that

16    motion had been resolved.  They chose this forum.  They knew

17    what the rules are.

18         We got their infringement contentions in May of 2022.

19    That's six months later.  And we didn't have a statement of

20    what the embodiment products were.  There was -- the only

21    conception and reduction to practice documents at that time

22    that were produced were the file histories for these patents.

23    So none of the internal documents that you would normally see

24    evidencing conception and reduction to practice, none of that

25    was produced in this case.

1          Another big category of documents that wasn't produced in

2    this case six months after it was filed were documents,

3    disclosures to third parties.  Now, the reason why these are

4    important, as Your Honor well knows, is these rules are meant

5    to front-load disputes.  The Defendant is meant to get an idea

6    of conception and reduction to practice disclosures to third

7    parties so we can use the discovery period to figure out what

8    Plaintiff's claims are, whether there were others involved,

9    how that would affect invalidity contentions, how that would

10   affect claim construction, whether there's issues of joint

11   ownership, whether there's issues of the scope of the claims,

12   whether, you know, particular Netlist employees needed to be

13   deposed to figure out the basis for these claims.  We weren't

14   given any of that opportunity.

15        In fact, not only were we not given these documents and

16   these disclosures at the initial disclosure phase, the

17   infringement contention phrase, we weren't even alerted that

18   there might be an issue that they were somehow searching for

19   these kind of documents, they couldn't find them, and would be

20   coming later.

21        In fact, when the parties negotiated a schedule in June

22   of 2022, Samsung sought a 90-day extended schedule because of

23   the addition of the two new patents that Mr. Cordell discussed

24   earlier today.  Netlist denied that request, pushed for the

25   schedule as it currently exists, and then proceeded through

1   discovery.

2       We served interrogatories in June asking for the very

3   things that should have been produced and disclosed with the

4   initial infringement contentions on conception, another ROG on

5   embodying products, another ROG on disclosures to third

6   parties.

7       Fast forward from June to September.  September was a

8   substantial completion of document production.  We didn't get

9   any of these documents at that time.  Fast forward to, you

10  know, October, Samsung asks again, Netlist, are your materials

11  complete; no real response at that time.

12      Finally, finally we get to November.  November 15th

13  Netlist produced over 30,000 pages of documents.  Didn't tell

14  us what was in it until November 22nd.  That's when they

15  amended their ROG response--not their infringement

16  contentions, but their ROG response--to now point to an

17  allegation that some of their products embody some of the

18  claims; also pointing to numerous documents for conception and

19  reduction to practice, numerous documents that were allegedly

20  showing that Netlist had disclosed certain subject matter of

21  their patents to third parties.  This is, again, one month

22  before the end of fact discovery, five months after local

23  rules require it to be disclosed, and 11 months into the case.

24      We immediately, immediately went to Netlist, asked them,

25  Withdraw these claims, it's far too late, far too prejudicial.

1    Netlist ignored that request, didn't substantively respond

2    until we met and conferred on our motion here the last day of

3    discovery.

4         Now, what does Netlist say in response?  Well, the

5    documents took a long time to find.  It was a big effort, and

6    there are a few things that are problematic there.  And here

7    this goes to the issue of diligence, which Your Honor knows is

8    one of the factors the Court considers when considering

9    whether an amendment is appropriate.  Here Netlist says, well,

10   the documents took a long time to find.  The problem here is

11   they didn't tell the Court or us when they started, what the

12   effort was.  All they provided was vague details that one

13   person was looking for them, and didn't tell us when that

14   person started, how much that person spent doing this.

15        But more so, Your Honor, even if they were looking for

16   these documents the whole time, this entire period prejudice

17   is compounding on the side of Samsung because we are being

18   deprived of an opportunity to investigate Netlist's claims.

19   They never raised this to us.  They never told us, We have

20   found a source of documents, we have identified that there may

21   be embodying products, we need more time to disclose that,

22   let's work out a schedule to do that.  They didn't do any of

23   that.

24        And, in fact, if you would think about how this process

25   would go, they have disclosed six supposedly embodying

1    products for patents, conception and reduction to practice

2    documents for six patents, disclosures to third parties for

3    six patents.  To the extent this investigation was ongoing,

4    you wouldn't expect it to be completed in a day or two; you

5    would expect that you would get some documents identified,

6    some theories identified at one point, and then maybe a day or

7    two later, a week later, a month later you would identify

8    something else.

9         But what did they do?  They waited to do this

10   investigation, identify the documents, go to an expert to

11   analyze the documents, and disclose everything, everything all

12   at once to Samsung.  It didn't disclose the first product when

13   it discovered that it may have a belief that it practiced a

14   claim.  It didn't disclose the conception documents early on

15   for one product or one patent when it was discovered.  They

16   dumped this entire thing on us in November at the very end.

17        If they were really trying to cooperate, Your Honor, what

18   they would have done is they would have produced this

19   material, updated their contentions as soon as each piece of

20   information was found, and they didn't do that.

21        So with that, Your Honor, I will pass the argument.

22             THE COURT:  All right.  Let me hear from Netlist,

23   please.

24             MR. SHEASBY:  May I have the elmo, Madam Courtroom

25   Deputy?

1        Netlist is a bit of a unique company in how it's

2    structured.  Netlist doesn't have any central repository for

3    conception reduction to practice documents.  The reason for

4    that is that patents are written after the products are

5    designed.

6        There is a declaration in the record from Jayson Sohi.

7    He is a Netlist employee who was involved in the second phase

8    of the production, and he talks about the fact that we don't

9    have organized conception and reduction to practice files; all

10   we have a electronic design files, and there are over 600 --

11   900 of those electronic design files that had to be analyzed

12   to identify the products.

13       I actually don't begrudge anything that Samsung said,

14   which is that if there was a prejudice for -- if this was

15   done in a lazy fashion and without diligence, there should be

16   consequences associated with that.  I was involved in this

17   document collection and production.  It was one of the most

18   complex collection processes I've ever been involved in.  It

19   literally involved having to open up design files, which

20   should have numbers on them, to find graphs and diagrams to

21   see if they had certain embodying features.

22       I want to correct three things.  There is no documents

23   that we are producing for -- before the filing dates of the

24   patents that disclosed the invention, that's a new argument.

25   That's never been raised before, and, in fact, it's incorrect.

1          The second issue is that we are not saying any of our

2     product designs actually practice the patents-in-suit.  The

3     reason for that is two-fold.  One is the product designs

4     stopped being sold or were never sold before the patents even

5     issued.  The second reason is that the product designs are in

6     most cases not complete; they just embody certain features

7     that reflect the conception and reduction to practice.  So we

8     do not intend to say, Oh, these products practice the patents

9     and, therefore, they're commercially successful.  That's --

10    it's not there.  It's not in evidence.

11         What we say in our interrogatory response is very precise

12    that they reflect certain of the embodiments that are

13    described in the specification, not that they reflect the

14    claims themselves.

15         The third thing is that I have done everything humanly

16    possible to sort of try to alleviate any prejudice that

17    existed.  It is correct that they didn't receive the documents

18    until November 15th.  We did involve an expert to analyze

19    them.  We did that intentionally so there wouldn't be a dump,

20    and on November 21st they would get the precise lists of

21    documents in a very detailed interrogatory response that had

22    the information.

23         We have unilaterally told them that if they need to file

24    another expert report on this subject, they may do so.  We

25    have unilaterally told them if there is third-party discovery

1    that they need, they can take it.  They haven't identified

2    anything.  We've said, If you need to recall one of our

3    witnesses to take this information, you can do so.

4        We recognize that these products, this information was

5    not available in May.  It was not intentional for it not to be

6    made available.  There was a good faith very, very complex

7    process to identify these documents.

8        To be very clear, there are no prefiling disclosure

9    documents that we're relying on.  We're not saying any of

10   these products actually practice the patents because they

11   existed before the patents and they just involve certain

12   features that are described in the patents.  And we are

13   prepared to give them whatever they need in terms of

14   additional time and additional deposition if they need

15   something.

16       They've asked for a four-month continuance of the case,

17   but if you do the math, we gave them the information November

18   21st.  Four months later would be April of 2023, and if they

19   need that amount of time to run these things to ground they

20   can.  I will note that they don't identify anything concretely

21   that they needed or would have done or would have changed.

22       This is not a situation in which I think they are bad or

23   that this is opportunistic.  This is a principled complaint

24   they make, and we are prepared to do everything we can to

25   remedy it.  But we do think there was good faith.  I think

1   Mr. Sohi's declaration establishes that.  And if they want to

2   retake a deposition, if they need additional time for an

3   expert report, they can have that.

4        Thank you, Your Honor.

5             THE COURT:  All right.

6        Anything further from Samsung?

7             DR. ALBERT:  Yes, Your Honor.

8        Just to correct the record, there -- as we identified in

9   our briefing, there were disclosures to third parties that

10  were identified in the interrogatory responses.  We identified

11  I believe 10 or 11 third parties that Netlist claimed in their

12  interrogatory responses that they disclosed subject matter of

13  the invention to.  And this goes to our fundamental prejudice.

14       We got notice of this, instead of at the beginning before

15  fact discovery began, at the very end.  And now their proposed

16  remedy is that we would, at the time we are readying for a

17  very busy trial, to run a whole nother discovery period on top

18  of trial prep, burdening Your Honor with additional motion

19  practice that's going to come forward, additional invalidity

20  contentions, potentially different additional claim

21  construction disputes based on their claims, and they still

22  haven't said why they didn't start this or finish it before

23  their infringement contentions.

24       So we have significant prejudice.  Their proposed remedy

25  doesn't address that prejudice.  It's fundamentally unfair for

1   Netlist to be able to freely prepare for trial while we're

2   busy investigating the claims that should have been provided

3   and the documents that should have been provided at the --

4   before discovery even began.

5        And the notion that counsel has bent over backwards to

6   provide us this information, we just don't see it, Your Honor,

7   because if there was a concern about providing this

8   information late, then they would have alerted us to this

9   issue day one, when they discovered that there was a potential

10  trove of conception and reduction to practice documents; or

11  barring that, they wouldn't have waited until November 15th to

12  produce 30,000 documents at once; they would have produced the

13  documents along the way as they found them.

14          THE COURT:  I've heard this, Doctor Albert.  I think

15  I've heard all I need to on this.

16          DR. ALBERT:  Thank you, Your Honor.

17          THE COURT:  Thank you.

18      All right, counsel.  It appears that I've now heard

19  argument on all these unresolved matters.  I've noted your

20  resolutions and resolved motions in the record earlier.  I

21  want to give you the Court's rulings on these unresolved

22  issues which should then complete all these matters being

23  covered one way or the other.

24      With regard to Samsung's motion to stay pending the IPR

25  review and the appeal pending before the Ninth Circuit

1    regarding the trial in the Central District of California,

2    Document 74, I'm going to deny that motion.

3         With regard to the motion for leave to supplement, I'm

4    going to deny that as moot given my ruling on the underlying

5    motion to stay.

6         With regard to the opposed motion to compel the

7    deposition of Dr. J.B. Lee, I'm persuaded that there has been

8    a good faith effort to exhaust the underlying sources prior to

9    reaching to depose Doctor Lee.  I am going to order Doctor Lee

10   to sit for a remote deposition within the next two weeks to be

11   videoed, to not exceed two hours, including the time consumed

12   by the interpreter--it's not two hours excluding the

13   interpreter time--to focus on these April of 2015 matters that

14   were raised before the Court today.  But I'm going to order an

15   up to two-hour deposition remotely of him to address these.

16        With regard to the motion to supplement infringement

17   contentions and the opposing motion to strike these

18   late-produced products purportedly practicing the patents and

19   the late disclosure on the Plaintiff's conception and

20   reduction to practice matters, those are Documents 126 and

21   130, I'm going to grant the motion to strike.  I think that it

22   is too late in mid-December with the discovery, fact discovery

23   closing on the 22nd of December, to bring in 30,000 documents.

24   I understand the argument that Nexflix's [sic] system is

25   somewhat unconventional and it was burdensome and took a long

1    time to discover all of this, but at the end of the day

2    Netflix chose this Court, it chose this Court knowing this

3    Court's local rules, it could have anticipated those local

4    rules and begun the production process earlier than it did.

5    But at the end of the day, a delivery of the documents and

6    materials pursuant to discovery in mid-November with discovery

7    closing in the middle of December and the intervening holidays

8    is just not reasonable, and it's not practical for Samsung to

9    recover from that.

10          I noted Mr. Sheasby's offers repeatedly in argument, If

11   they need this they can have it, and if they want that they

12   can have it.  The Court sets the schedule for this case.

13   Counsel doesn't offer what it will and won't do after the

14   close of discovery.

15          I'm going to grant the motion to strike and I'm going to

16   deny the motion to amend the infringement contentions.

17          And that should resolve all the matters that were not

18   able to be worked out by counsel today, and it should clear

19   the decks, so-to-speak, on this accumulated group of motions.

20   And hopefully, it is the Court's hope, that this resolution

21   both by agreement and by argument before the Court today will

22   put this case back on a posture that will allow it to move

23   forward for its current setting next spring and the trial can

24   take place as currently scheduled.

25          All right.  Is there anything that was set for today that

 1    either party's aware of that we did not take up or otherwise

 2    resolve?

 3              MR. SHEASBY:  No, Your Honor.  Nothing for

 4    Plaintiffs, Your Honor.

 5              MR. CORDELL:  Nothing for Defense, Your Honor.

 6              THE COURT:  All right.  That will be the Court's

 7    order.  That completes today's hearing.  You're excused,

 8    counsel.

 9        And the Court stands in recess.

10                        (End of hearing.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  I HEREBY CERTIFY THAT THE FOREGOING IS A

2              CORRECT TRANSCRIPT FROM THE RECORD OF

3              PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4              I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5              FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6              COURT AND THE JUDICIAL CONFERENCE OF THE

7              UNITED STATES.

8

9              S/Shawn McRoberts        01/21/2023

10            _____DATE_____
               SHAWN McROBERTS, RMR, CRR

11           FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25