```
1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE EASTERN DISTRICT OF TEXAS
2                             MARSHALL DIVISION

3    NETLIST, INC.,               (  CAUSE NO. 2:22-CV-203-JRG
                                  )
4             Plaintiff,          (
                                  )
5    vs.                          (
                                  )
6    MICRON TECHNOLOGY, INC.,     (
     et al.,                      )  MARSHALL, TEXAS
7                                 (  AUGUST 22, 2023
              Defendants.         )  9:00 A.M.
8    _____

9

10

11   _____

12                            MOTION HEARING

13                  BEFORE THE HONORABLE ROY S. PAYNE
                      UNITED STATES MAGISTRATE JUDGE

14

15   _____

16

17

18

19

20

21

22                     SHAWN McROBERTS, RMR, CRR
23                      100 E. HOUSTON STREET
                        MARSHALL, TEXAS  75670
24                         (903) 923-8546
                   shawn_mcroberts@txed.uscourts.gov
25
```

```
1                          A P P E A R A N C E S

2
          FOR THE PLAINTIFF:    IRELL & MANELLA, LLP -
3                               LOS ANGELES
                                1800 AVENUE OF THE STARS
4                               SUITE 900
                                LOS ANGELES, CA 90067-4276
5                               (310) 203-7096
                                BY:  MR. JASON SHEASBY
6
                                McKOOL SMITH, P.C. - MARSHALL
7                               104 E. HOUSTON ST., SUITE 300
                                MARSHALL, TEXAS  75670
8                               (903) 923-9000
                                BY: MR. SAMUEL BAXTER
9
          FOR THE DEFENDANTS:   WINSTON & STRAWN, LLP -
10                              REDWOOD CITY
                                255 SHORELINE DRIVE, STE. 520
11                              REDWOOD CITY, CA 94065
                                (650) 858-6443
12                              BY:  MR. MICHAEL RUECKHEIM
                                     MR. RYUK PARK
13
                                WARD, SMITH & HILL, PLLC
14                              1507 BILL OWENS PARKWAY
                                LONGVIEW, TEXAS  75604
15                              (903) 757-6400
                                BY:  MR. WES HILL
16
          OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
17                              100 E. HOUSTON STREET
                                MARSHALL, TEXAS  75670
18                              (903) 923-8546

19

20

21

22

23

24

25
```

1          THE COURT:  Good afternoon.  Please be seated.

2      For the record, we're here for the motion hearing in

3  Netlist versus Micron Technology, et al., which is Case

4  No. 2:22-203.

5      Would counsel state their appearances for the record?

6          MR. BAXTER:  Good afternoon, Your Honor.  Sam Baxter

7  with McKool Smith and Jason Sheasby for the Plaintiff.  And

8  we're ready to go.

9          THE COURT:  All right.  Thank you, Mr. Baxter.

10          MR. HILL:  Good afternoon, Your Honor.  Wesley Hill,

11  Mike Rueckheim, and Byuk Park on behalf of Micron.  And we're

12  ready to proceed.

13          THE COURT:  All right.  Thank you, Mr. Hill.

14      Don't worry.  I see you, Mr. Sheasby.

15          MR. SHEASBY:  I wanted to stand as a sign of

16  respect.

17          THE COURT:  Thank you.

18      We have motions by both sides on the agenda today, but

19  the Plaintiff's motions were filed first, so unless counsel

20  have a better idea, we'll just start with those.

21          MR. SHEASBY:  May it please the Court, Your Honor.

22      This is motion Docket No. 131, which I think is the first

23  in order that was filed this relates to license agreements

24  that have been produced.

25      And one of the things I think is very important is that

1    it creates a dangerous precedent when the holder of a document

2    serves as the gatekeeper as to the ultimate admissibility of

3    the document, and the issue that we have is that there is a

4    corpus of license agreements that relate to DRAM or memory

5    module that Micron has entered into over a period of its

6    history.  Those agreements are properly discoverable.  They

7    relate at the same level to the same technology as the

8    patents-in-suit and, therefore, they're technologically

9    comparable.

10        What Micron is doing, and I don't attribute any ill-will

11   towards it, is that there is at least one agreement, which is

12   the Rambus agreement--and there are likely others--that it is

13   self-selected and refuse to produce.  And it hasn't refused to

14   produce them because they're not technologically comparable;

15   it has refused to produce them for various reasons.  For

16   example, it said, Well, this was part of a settlement of

17   litigation, or in the case of Rambus, there was a

18   Rambus/Samsung agreement that was signed.  My expectation is

19   the terms of the Rambus/Micron agreement are similar to the

20   Rambus/Samsung agreement.  And apparently Micron's counsel sat

21   in the hearing -- the trial between Netlist and Samsung and

22   was unhappy with the decisions that Judge Gilstrap made

23   regarding the use of that agreement.

24        I would respectfully submit that the decision as to

25   admissibility is different from the decision as to

1  responsiveness to a production.  The agreements that relate to

2  DRAM technology should be properly produced; they should not

3  be self-edited or self-selected.  Judge Gilstrap can properly

4  or Your Honor can properly make the decision as to whether the

5  agreement is admissible in front of the jury and the use that

6  can be made to that agreement.

7       If this was a situation in which we were looking for

8  agreements that were not technically comparable agreements --

9  let's say Micron had a division that was making cell phones.

10  It is perfectly principled for Micron to say, We don't think

11  the division that produces cell phones needs to be produced,

12  and that is something we can engage on a technological basis.

13  The argument is we don't like the rate or we think you're

14  going to misuse this agreement in front of the jury is

15  usurping the role of the judge.

16       And so we respectfully submit that Micron be ordered to

17  produce all license agreements it has entered into relating to

18  DRAM.

19       Thank you, Your Honor.

20            THE COURT:  And is that the way you would propose to

21  define the relevant technology as relating to DRAM?

22            MR. SHEASBY:  I would, and I'll explain to you why.

23       It is quite clear to us that the ability for us to agree

24  on what is in and out from a technologically comparable

25  standpoint is not feasible.  So, for example, Micron has at

1    times said, Well, worldwide license agreements are not

2    comparable because they may include things in addition to

3    DRAM.  Flip-side is it's produced and it's relying on

4    worldwide license agreements when it desires to do so.  In

5    fact, it is arguing that two worldwide license agreements that

6    we entered into with SK hynix and Samsung are highly

7    comparable.  Those agreements include DRAM, but they also

8    include lots of other technologies.  And so a way to stop us

9    from having this fight is produce all agreements that licensed

10   DRAM.  We can then have a fight about response -- relevance

11   and admissibility in front of the Court.

12        THE COURT:  And is there any disagreement between

13   the parties about the relevant time frame?

14        MR. SHEASBY:  So they went back 10 years, they said.

15   I'm slightly uncomfortable with the fact that they arbitrarily

16   selected 10 years.  That wasn't the -- certainly we did not

17   limit the request.  And so they didn't identify there as being

18   any extraordinary burden as to going back longer than 10

19   years, and so they have set a 10-year arbitrary limit.  That

20   would bring us back to 2013, thereabouts.  They're actually

21   relying on agreements that we entered into before 2013 for

22   their case against us.  And so, once again, I'm concerned at

23   that arbitrary 10-year limit.

24        If they would have come to me and said, Listen, if we go

25   back 20 years it's going to be a thousand-fold agreements;

1    we're not just going to do that, that would be something we

2    could engage, but I've seen no principled reason for the

3    10-year cutoff.  It doesn't in any way relate to the nature of

4    the case or the technology.  The patents-in-suit were filed

5    more than 10 years ago, and so the technology is a vintage

6    that's actually much older than 10 years.  So there is also a

7    concern about that arbitrary 10-year cutoff.

8              THE COURT:  What year does the damages model begin?

9              MR. SHEASBY:  So the damages model began for the two

10   patents-in-suit that relate to DDR4.  DDR4 began to be

11   developed in 2011, I believe, and I believe our patents were

12   filed in 2004 and 2007.

13             THE COURT:  All right.  Thank you, Mr. Sheasby.

14             MR. RUECKHEIM:  Your Honor, Mike Rueckheim on behalf

15   of the Micron Defendants.

16        Your Honor asked how Netlist defines the relevant

17   technology here, and Mr. Sheasby I think focused in on DRAM.

18   Netlist has already defined the relevant technology here, and

19   this is mentioned in Micron's briefing.  There is three --

20   Netlist served a document request type letter first thing in

21   the case with hundreds of different topics in it, and there's

22   three topics in there, 33, 44, and 75--it might be four; I

23   think 62 as well is mentioned in our briefing--that defines

24   -- that says, We want license agreements relating to L R dim

25   data buffer retiming features as used in LRDIMM.  We have

1    license agreements relating to implementing power management

2    circuitry on the modular board and the DDR5 DIMM.

3         And so that's what we did.  We produced -- there's a

4    little difference, I think, maybe in the disagreement or

5    changed in scope as to what Netlist is seeking in its motion

6    versus what they asked us to produce or we did produce.  And

7    as far as the relevant time frame, most of the patents, four

8    of them in this case, issued in 2020 to more recent, so just

9    within the last couple of years.  There is the two patents

10   that relate to what's called HBM, or they're accusing HBM

11   products that issued earlier in time, 2016, 2014, but the

12   first accused sale of HBM products wasn't until 2021.  So we

13   chose 10 years because it's well before any hypothetical

14   negotiation in this case.

15        So that takes us to I think the real problem, as --

16   counsel for Netlist focused in on this Rambus agreement.

17   That's the real dispute here--whether or not we should produce

18   this Rambus agreement.  And we have withheld the Rambus

19   agreement.  We've offered to produce the Rambus agreement with

20   the royalty amount redacted out.  And the problem here, Your

21   Honor -- and I agree with Mr. Sheasby that this can be

22   addressed at a MIL stage or a *Daubert* stage or an

23   admissibility-type argument, but the problem here is I did

24   attend the Samsung/Netlist trial, and as stated in Netlist's

25   own briefing--this is from the joint status report they filed

1    last night--they mentioned that the royalty amount, this

2    amount was mentioned repeatedly at trial.  And they did.  They

3    mentioned this huge amount of the Samsung/Rambus license

4    repeatedly at trial, yet when they're talking to Judge

5    Gilstrap in the pretrial proceedings--and we've quoted a lot

6    of these--this is Netlist's counsel says, "Mr. Cordell,

7    Samsung's counsel, is right.  If the expert would have come in

8    and said X hundred million dollars is what they paid Rambus,

9    give us that.  That would be totally inappropriate."  Totally

10   inappropriate.  And it is totally inappropriate.  To give the

11   jury such a high number like that, it risks jury confusion,

12   and that's exactly why we're offering the license with the

13   license amount redacted.

14       There's a lot of issues that can come up at MILs and we

15   can address it then, we can address it at *Daubert*, but to make

16   sure this issue was addressed, because it's an important

17   issue, we are offering to produce it with that amount

18   redacted.

19           THE COURT:  All right.  I don't see any basis to

20   redact the amount during discovery if you're not able to show

21   that it is not discoverable.  And I understand that you take

22   the position that improper use was allowed of the amount at a

23   prior trial.  I don't know what to do with that argument.

24   You're saying the Court is not able to properly control the

25   arguments of counsel?  I'm not sure what.

1           MR. RUECKHEIM:  No, Your Honor.

2       I do think this can be addressed in MIL or *Daubert*.

3    This -- so the reason we're withholding is lack of relevance.

4    This is a non-technically comparable license.  Counsel for

5    Netlist just said it was technically comparable, but its own

6    expert in the Samsung case said the opposite; it shouldn't be

7    used to determine the royalty amount.  And so that's the

8    reason for withholding it, but I do understand Your Honor's

9    point that this can also be addressed at a later time.

10          THE COURT:  All right.  Well, with respect to the

11   Rambus license, I will order that it be produced unredacted.

12       With respect to other licenses, point me to the

13   description that you say is in your brief of the relevant

14   technology.

15          MR. RUECKHEIM:  If Your Honor has -- I think we

16   copied into the joint status report that was filed last

17   night --

18          THE COURT:  All right.

19          MR. RUECKHEIM:  -- as -- I don't have the docket

20   number, but it was filed last night.

21          THE COURT:  That was Docket No. 152.

22          MR. RUECKHEIM:  152?  And on page 3, if you see near

23   the bottom of the page, there's some wording in bold.  That's

24   directly quoting Netlist document requests in this case.

25          THE COURT:  And what you're saying is that the only

1    licenses that they have requested in discovery are those that

2    are described at the bottom of page 3 of your joint notice?

3              MR. RUECKHEIM:  That is correct, Your Honor.

4              THE COURT:  All right.  Well, let me hear the

5    response to that.  Thank you, Mr. Rueckheim.

6              MR. SHEASBY:  Your Honor, that's not accurate.

7    There was an original letter that was sent out to begin to

8    discuss documents that are relevant.  We asked for certain

9    license agreements.  We listed 163 categories of license

10   agreements; 163 categories of topics that we wanted discovery

11   on.  It soon became apparent to us that we were not

12   comfortable with the way Micron was identifying the buffer or

13   relating to buffer or relating to HBM or relating to on-module

14   power management because that would require it to literally go

15   through each of the patents that were licensed to make a

16   determination, which I -- they could not do and I -- it's not

17   proper for them -- it would be -- it's inconceivable -- it's

18   unfeasible for them to represent that they went through each

19   of the license agreements and identified a patent that relates

20   to a buffer or relates to on-module power management or

21   relates to some feature of an LRDIMM.

22       And so what we did in our subsequent meet and confers is

23   we just said basically, Give us anything that relates to

24   semiconductor or semiconductor manufacturing, because DRAMs

25   and HBM are made--HBMs in particular are made using a

1  semiconductor manufacturing process--memory products,

2  transistors or circuits, or components, or services of other

3  personal computers.  That's the revised request we made

4  because we realized it was impossible for them to confirm

5  compliance with our original request because we required them

6  to look at every single patent.

7      And so basically what we've done is this is the bidding

8  that we came to them as a compromise with.  They declined that

9  compromise and that led to the motion practice.

10          THE COURT:  And how would DRAM stand as a substitute

11  description for this?

12          MR. SHEASBY:  Yeah.  So DRAM is all of these things.

13  And it's a semiconductor, it's used in memory products,

14  transistors, and circuits, and it's a component of servers and

15  other personal computers.  And so it's a way of them being --

16  easily being able to look at the agreement and say, Did this

17  agreement license DRAM products?  If the agreement licensed

18  DRAM products, it would fall into these categories.

19      And so the idea is to make this in a way that doesn't

20  place an undue burden and doesn't create additional disputes,

21  because the problem with the original requests--and this is

22  part of our responsibility--is there's no way they've gone

23  through each of the license agreements to confirm whether one

24  of the patents relates to the specific technology in the --

25  that are claimed by the patents, and so we went for the

1    broader category there.

2        I should also say I misspoke, Your Honor.  The first

3    patent was filed in 2009.

4            THE COURT:  All right.  Thank you, Mr. Sheasby.

5        Mr. Rueckheim, tell me why I shouldn't use DRAM as the

6    descriptor for the relevant technology, at least at the

7    discovery stage.

8            MR. RUECKHEIM:  So I guess I want to maybe address

9    what Netlist actually served as far as its request for

10   licenses.  And so what -- I think Mr. Sheasby said that it's

11   impossible for Micron to go there and look for licenses that

12   cover those requests.  It wasn't.  We did.  And we produced

13   them.

14       And then as far as comparability, comparability I believe

15   is a subject matter for really experts to discuss.  And so

16   comparability on the production stage is striking me a little

17   bit odd, only because they've asked for production of certain

18   materials and we produced them.  And I think Mr. Sheasby

19   really just pointed to it's his motion which changed the

20   request and now is asking for that material I guess in

21   addition to anything involving DRAM.  So I'm a little thrown

22   off by it.

23           THE COURT:  Well, you know, under the Eastern

24   District rules, the discovery obligation for documents is not

25   really tied to the requests that a party has made; it's tied

1    to relevance.

2              MR. RUECKHEIM:  Understood, Your Honor.

3              THE COURT:  And so that's why I'm trying to figure

4    out the best way to describe what for discovery purposes would

5    be relevant technology.  I don't like having orders that are

6    not easily understood.  And I'm willing to go with your

7    timeline, the last 10 years, especially since, as I understand

8    it, you've already done a search in that time frame, and --

9    but I want to capture the -- some relevant field of

10   technology, and I'll go with DRAM unless you can talk me out

11   of it.

12             MR. RUECKHEIM:  My co-counsel Mr. Park reminded me

13   it's probably more accurate to say DRAM modules, just because

14   this case is more about the actual module than the DRAMs that

15   are on the module.  But, Your Honor, I am fine for production

16   purposes DRAM modules going back 10 years.

17        I will say that there's -- you know, just to avoid any

18   confusion in the future, to the extent there's licenses

19   involving trade secrets, that that's definitely not comparable

20   in any sense here under our view or -- I think Mr. Sheasby

21   mentioned licenses regarding semiconductor manufacturing.

22   That's another one that has nothing to do with the issues in

23   this case.  But to the extent the Court is -- wants to adopt

24   DRAM modules, that's perfectly acceptable for Micron.

25             THE COURT:  All right.

1          MR. SHEASBY:  A couple of issues.

2      The idea that the proposal that we were asking for was in

3  our motion, it's just inaccurate.  It was in our

4  correspondence mirroring what we just said in the motion

5  itself.  So it wasn't like we just came up with something in

6  the motion; we asked them to produce these in meet and confer

7  and they declined.

8      Second issue.  Once again, the DRAM versus DRAM module is

9  of issue with us, and the reason for that is that HBMs are not

10  DRAM modules.  HBM, which is one of the accused products, are

11  four or six little wafers of DRAM that have holes drilled into

12  them and are stuck together.  Those are not a DRAM module.

13  Those are actually produced at a semiconductor manufacturing

14  stage because of the TSVs that run through them and because

15  they're packaged, and that's exactly why I said DRAM as a way

16  of being able to sweep in both HBM technology as well as

17  module technology.

18          THE COURT:  All right.

19          MR. RUECKHEIM:  With that clarification, Your Honor,

20  we're fine with DRAM.

21          THE COURT:  All right.  So I'll grant the motion

22  with respect specifically to the Rambus license, but further,

23  with respect to any additional licenses that have not already

24  been produced that relate to DRAM over the last 10 years.  And

25  that takes us to the next motion.

1          MR. SHEASBY:  Yes, Your Honor.  I believe the next

2     motion on the docket is the --

3          THE COURT:  It's Document No. 132, I believe.

4          MR. SHEASBY:  Yes.  That's correct.

5       And this motion has I think three parts to it.  The first

6     part of it is something that we tried very hard to resolve and

7     it should not be in front of Your Honor--I will just leave it

8     at that--which is that Samsung -- SK -- Micron has taken the

9     position that if -- it has PowerPoint presentations that

10    include in them a circuit diagram or a line of what it would

11    describe as LTR code.  It refuses to produce those because it

12    says they're source code and they can be only examined on a

13    source code computer.

14      So we went back to Micron and we explained to them a

15    couple of issues.  And this is the protective order, and I'll

16    show it to Your Honor.  The protective order doesn't talk

17    about PowerPoint presentations that include a line of code or

18    a circuit diagram; they talk about source code and live data.

19    There's no reference to documents containing source code or

20    live data as itself being a source code document.

21          THE COURT:  All right.

22          MR. SHEASBY:  And you see, if you go through the

23    whole definition of source code, there is no part of the

24    source code definition that relates to a PowerPoint

25    presentation that includes a circuit diagram.  There is an

1    express provision for instances in which a document includes

2    source code material that allows for them to be printed out,

3    allows them to be used like any other document, as long as

4    they have a special source code designation on it.

5         So source code can be printed out.  The problem is the

6    following:  The source code that can be printed out is only 75

7    consecutive pages or 950 total pages.  So these are large

8    groups of PowerPoint presentations and documents that Micron

9    is claiming fall into the definition of source code material

10   because they may include a circuit diagram, they may include a

11   line of code.

12        It's impossible for us to get and access those documents

13   because they treat them on the source code computer, and if we

14   ask to print them out, they say you've exceeded your 950

15   pages, you're done.  Of course 950 pages is not the maximum;

16   it's a rule of reason.

17        So we've proposed the following compromise to Micron.  If

18   they will allow the printout of the PowerPoint presentations

19   and memorandum, we will treat them as source code.  We will

20   treat every single page with the save gravity of the

21   protection of source code in terms of who can look at it, when

22   it can be printed out, how it can be printed out.  But the

23   ability for you to put a huge number of PowerPoints, which we

24   need to prepare our case, on a source code computer, limit the

25   number of printouts, destroys the purpose of the protective

1   order which is allow both -- a balance between protection and

2   being able to advance the case.  I have no idea why the

3   proposal that we've made, which is print out the documents, we

4   will treat them all as source code protected, is not a

5   sufficient resolution to this dispute.

6           THE COURT:  Tell me -- you mentioned PowerPoints.

7   What are the other categories of documents in which this

8   occurs?

9           MR. SHEASBY:  Data sheets, PowerPoints, and memos.

10          THE COURT:  And memos meaning memos back and forth

11  among Micron --

12          MR. SHEASBY:  Employees, yes.

13          THE COURT:  Employees.

14          MR. SHEASBY:  And Excel spreadsheets.  That's the

15  other one.

16      So basically the ruling would be anything that is in a

17  PDF format which is not live, and by being not live, it

18  doesn't fall in the definition of source code, and it can't

19  be -- and anything that's PDF format, a PowerPoint format, a

20  memo format, or an Excel format we will treat as source code

21  protection, but it should be allowed to be printed out

22  and -- as such.

23          THE COURT:  All right.  And so really you're just

24  focused on having those not count in the number of pages of

25  source code that you're allowed under the protective order.

1           MR. SHEASBY:  Right.  It's the consecutive page

2   limitation and to the extent that the presentations are

3   greater than 75 pages, and it's the -- it's 950-page

4   limitations.

5       And literally I see them.  They brought examples with

6   them.  May I approach?

7           MR. RUECKHEIM:  Sure.

8           MR. SHEASBY:  These are the type of things that

9   they've put on the source code computer and are limiting our

10  ability to print out.  This is a PowerPoint presentation that

11  was made by an employee.

12      I won't show any page.  Don't worry.  Don't worry.  Don't

13  worry.

14      And so this is a memo -- there's a memo that I'll

15  approach Your Honor with so you can see it.

16          THE COURT:  All right.

17          MR. SHEASBY:  It's a memo.  It's not source code;

18  it's a PDF.  It's screenshots of an excel spreadsheet that

19  were taken by an engineer and created.

20          THE COURT:  And what is your understanding of the

21  purpose for which these documents were created?

22          MR. SHEASBY:  These documents were created by

23  engineers as they were describing the design of their

24  products.

25      And so one of the things I don't want to have is a debate

1    about whether Micron should vigorously protect its

2    confidential information.  They should.  They have every right

3    to make sure that -- here's another example, if I may, Your

4    Honor.  May I approach again?

5              THE COURT:  All right.

6              MR. SHEASBY:  So this is physical annotations of

7    designs where engineers are describing what -- and

8    interpreting what a figure shows.  And then there's a

9    dozen -- I'm just holding them up.  There's a pile of these

10   PowerPoint presentations.

11             THE COURT:  And is it your understanding that these

12   are precursors to the written or compiled source code?

13             MR. SHEASBY:  So there are two things.  They are

14   interpretations of the compiled source code or they are -- not

15   everything is expressed in source code.  For example, most of

16   the modules do not have source code associated with them; they

17   just have circuit diagrams.  So these may be actually be the

18   -- most of this is the interpretation of the operation of

19   what's occurring at a high level.

20        I can pass another one up, Your Honor, which I think may

21   be more apt.

22             THE COURT:  All right.

23             MR. SHEASBY:  Basically what they're doing is

24   they're interpreting the design of their products so that --

25   this is an engineer explaining what the design and operation

1    of the products is together.  So these are the crucial

2    documents that are the glue that -- they're annotated, they

3    have detailed explanations of what the designs are doing and

4    how they're doing.  They are basically the critical documents

5    that we will use to establish infringement.

6         And so what we ask is -- we have no problem if they're

7    treated as source code.  We would just ask that we be allowed

8    to have anything that's in a PDF format, anything that's in a

9    PowerPoint, Excel, or Word memo format that did not exceed

10   the -- not count in the 950-page limit or the 75-page minimum.

11   That's all we ask.

12             THE COURT:  All right.

13             MR. SHEASBY:  Thank you, Your Honor.

14             THE COURT:  Thank you.

15        I will return these documents for your use.

16             MR. SHEASBY:  Thank you, Your Honor.

17             MR. RUECKHEIM:  Your Honor, Mike Rueckheim again for

18   Micron Defendants.

19        I think Mr. Sheasby made a little bit of my argument for

20   me at the end there.  These are engineering documents,

21   critical documents, Micron's most confidential information

22   describing the design of the accused products here, the actual

23   design.  They designed and they are considered design for

24   designs that go into the implemented products that are at

25   issue in this case.

1          And we have all the documents here.  We can walk Your

2    Honor through exactly how they meet the protective order,

3    which we complied with.  Definition of source code material is

4    something that defines a physical arrangement of circuits,

5    such as circuit schematics, which Mr. Sheasby just pointed out

6    to Your Honor.  Layouts, placement, and routing information

7    that was --

8               THE COURT REPORTER:  If you would slow down, please.

9               MR. RUECKHEIM:  Oh, no worries.

10         The protective order also -- this is Docket 46 at 6 to 7

11   also defines any files containing any of the foregoing

12   schematics, layouts are also source code material.

13         And so what has happened since filing the motion, Your

14   Honor, is that Netlist's counsel asked us to take again a look

15   at six of the documents on the machine and provide redactions

16   of those documents.  For example, the first page Mr. Sheasby

17   showed Your Honor, I don't believe--I just looked at it

18   quickly-- would -- you know, would be redacted.  And it would

19   just be the implementations that are in the actual design.

20   And we're happy to do that.  We told Netlist we're happy to do

21   it and we're hoping to have that production complete by the

22   end of the week.

23         And then Mr. Sheasby also mentioned to me for the first

24   time today that his concern is really printouts, and I told

25   him I'd like to consider that with the client to see if

1    there's an issue.  But as I sat here I realized there is no

2    issue.  There's a hypothetical issue.  Netlist has not

3    exceeded any printout request nor have we rejected any

4    printout request.  This is a hypothetical concern.  I don't

5    see any reason why Netlist would want to print the entirety of

6    all these PDF documents.  I think it's looking for something

7    more broad and undefinable.  But if there's a concern, let's

8    address it at the appropriate time.

9            THE COURT:  Well, Mr. Rueckheim, I guess that the

10   page limits on copying are something that exist only with

11   respect to source code.  Right?  Other relevant documents do

12   have to be copied and turned over.  So I guess that gets us

13   back to the question of why are these documents being treated

14   as source code.

15           MR. RUECKHEIM:  It's the inclusion of the layouts,

16   the schematics, the circuits that show the design of the

17   accused products that are included in these documents.  As

18   Mr. Sheasby said, these are the critical documents showing the

19   features here, the features that Micron has considered.

20      I have more examples for Your Honor if you'd like to see

21   in camera review of these documents that are actually showing

22   the circuit diagrams here.

23           THE COURT:  You know, referring to them as the

24   critical documents that show the operation of their devices is

25   just a very compelling reason for the Plaintiff to want them.

1          MR. RUECKHEIM:  Plaintiff has them, Your Honor.

2    They're available for inspection.  We offered to redact out

3    -- I'm sorry.  Plaintiff has them for inspection.  They have

4    them.  When I say 'redact out', I mean take out -- I'm just

5    going to hold this up.  I don't know if Your Honor can see it,

6    but diagrams like this, redact those out and then produce the

7    rest of the information to Plaintiff.  But they can see this

8    diagram and the entire document, if it wants, on the source

9    code computer.  So our offer to produce these redacted, they

10   still have the full document.  We're not trying to hide

11   anything; we're just worried about protecting the

12   confidentiality of Micron's confidential source code material.

13          THE COURT:  And I'm looking at the protective order

14   now.  Where within the protective order is source code defined

15   in the manner you're relying on?

16          MR. RUECKHEIM:  This is paragraph 8 of the

17   protective order, and I believe -- I don't have the protective

18   order in front of me.  I have the relevant quote from the

19   briefing.  In fact, now I do have the protective order in

20   front of me.  So it is -- it starts at the beginning of

21   paragraph 8 and then on the next page, the first full

22   sentence, this is on page 6.

23          THE COURT:  So do you have an estimate as to the

24   approximate number of pages of the materials we're talking

25   about here?

1      MR. RUECKHEIM:  Your Honor, they've asked about six

2   documents, and we have the six documents here as far as

3   printout.  As far as the number of pages that Netlist would

4   later request to print out of these, it's completely unclear

5   if Netlist believes these are the documents it wants to use to

6   show alleged infringement or other source code, or if they

7   just want to print out one page of these documents.

8      THE COURT:  All right.

9      MR. RUECKHEIM:  And we have a better estimate of it,

10  Your Honor.  Like I said, Netlist asked us to redact out what

11  we believe is the -- really the most confidential portion of

12  these and produce the rest and print it -- copy outside the

13  source material machine so we'll have a better estimate here

14  based on the number of pages redacted.

15     THE COURT:  All right.  Thank you, Mr. Rueckheim.

16     MR. SHEASBY:  Your Honor, I think it would be fair

17  to say that no one thought PowerPoint presentations and memos

18  and Excel spreadsheets on Netlist's side was going to be

19  locked up in a source code vault and made unusable.  What we

20  know is this.  We know that the protective order has a

21  procedure for when source code materials are part of a larger

22  document, and what that requires you to do is you can use it

23  as a normal document, you just need to stamp the specific

24  pages that contain the source code as 'source code'.

25     THE COURT:  You know, Mr. Sheasby, the provision

1    you're talking about is describing a situation where the

2    receiving party uses it in a report or a brief or some other

3    document that the receiving party creates.

4          MR. SHEASBY:  I agree, Your Honor.  My point is, is

5    that the parties contemplated and Micron is clearly tolerating

6    the presence of source code -- what they define as source code

7    in a document that's not locked up on a computer.  That's the

8    point I'm trying to make, which is to say that we will treat

9    the entire -- for Excel spreadsheets, for Excels, PDF, and

10   Word documents, we will treat the entire document as source

11   code only.  We just ask that we be relieved from the 950-page,

12   75 pages.  That alone that they brought right now would exceed

13   our limit.

14         THE COURT:  So tell me what number of pages you

15   expect this might include.

16         MR. SHEASBY:  I don't know what additional PDF pages

17   they would have, and so what I would request is that any

18   PowerPoint, Word document, or Excel document that is put in

19   the source code computer not count against page limits, and we

20   treat it as source code protected only.

21         THE COURT:  What I am willing to do is to fairly

22   arbitrarily pick a number and add it to what the protective

23   order already provides to cover these categories that you've

24   mentioned--PowerPoints data sheets, memos, or Excel

25   spreadsheets that have what Micron believes meet the

1    definition of source code--and I'll arbitrarily put that at

2    500 pages.  And if you think you can justify more than that,

3    you can meet and confer and then request it if you need it.

4            MR. SHEASBY:  And just for a clarification, it's

5    only the pages they identify as source code that count as

6    source code.

7            THE COURT:  It would be the pages that they -- yes,

8    that they believe meet this definition of source code.

9            MR. SHEASBY:  Okay.  Great.  I think that should be

10   enough to get what we need done.  Thank you, Your Honor.

11           THE COURT:  All right.  Your next motion I believe

12   is --

13           MR. SHEASBY:  Your Honor, that was only one part of

14   the motion --

15           THE COURT:  Oh, all right.

16           MR. SHEASBY:  -- I'm sorry to say.

17           THE COURT:  Me, too.

18           MR. SHEASBY:  The next part of the motion is the

19   continued failure to provide the RTL code for the HBM products

20   that are at issue in this case.

21       And to give you some context, HBM products are made up

22   of a group of chips.  Each of those chips will have a format

23   that's designed based on the RTL code.  The motion was filed

24   because when we went to look at the RTL code, there was an

25   absolute morass of unorganized RTL code that had been

1   literally taken out of whatever context it was in and dropped

2   in the database such that we could not understand what

3   particular RTL code went to what particular chip.

4       They -- in the opposition, they point to a file path

5   where they say go to this file path and you'll find the

6   correct RTL code.  We went to that file path and that file

7   path was for only a minor portion of the RTL code and it

8   actually omitted RTL code for a number of their designs.

9       We had a follow-on declaration that we submitted last

10  night from Doctor Barr that talks about this issue.  And so

11  what is the actual item in this situation?  There are four dye

12  designs that are -- they've disclosed as having RTL code for

13  them.  What we need is for Micron to definitively identify not

14  a morass of hundred or millions of lines of code, but the

15  universe of RTL code that relates to those four designs.  They

16  have, to date, been unable to do that.

17      We went to their path that they identified in their

18  opposition.  That path went to a subset of folders that did

19  not include two of the four core dyes that they designed, and

20  that subset of folders was only a small subset of the millions

21  of lines of RTL code on the drive.

22      So we have no idea why they put millions of lines of RTL

23  code on the drive if there is only a small subset that

24  actually depicts the products.  We don't know if the path that

25  they describe depicts all the designs, and so what we need is

1    a procedure where they definitively identify what RTL code

2    relates to each of the dyes.

3        I should say that this is -- if we're talking about

4    strict adherence to the protective order, the protective order

5    is -- requires that the source code be produced in tact.  And

6    so what they did was pull out random folders of RTL code is

7    the exact opposite of what the protective order requires if we

8    want to be strictly adhered to that.

9        So this is impossible, it seems to me -- I've been in

10   many, many situations in which one side says they didn't

11   produce the source code, the other side says they did produce

12   the source code, there are competing declarations, and there's

13   no way for the court to arbitrate it.

14       And so what I would just ask is a definitive statement as

15   to what is the complete RTL in in-tact, unaltered form for the

16   four core dyes they have designed.

17            THE COURT:  All right.

18            MR. RUECKHEIM:  Your Honor, Mike Rueckheim again.

19       So there has been a breakdown in the meet and confer

20   process I think a little bit here because -- particularly

21   looking at the declaration Netlist submitted yesterday with

22   the joint status report, it seems to disagree with Netlist's

23   opening motion.  Netlist declarants stated that Micron

24   actually did identify the directors that have RTL, and that he

25   reviewed it and did not see RTL for two of the designs that

1    Mr. Sheasby mentioned.  And in reality, there are -- there is

2    no RTL for those two designs, and so that's not surprising.

3        And I think one of the problems we have here is that

4    the parties had negotiated early in the case, because of the

5    complexity of the case, that Netlist would -- that Micron

6    would provide an employee to help Netlist's review of the

7    source code material, and Netlist later changed its mind

8    halfway through the case and asked Your Honor successfully

9    to exclude Micron from having somebody there to help with

10   identification.

11       That set aside, we did on two occasions show -- this is

12   after the fact, after the Court had ordered Micron doesn't

13   have to have an employee there or amended the protective

14   order.  We did show Netlist's reviewer where the RTL code is.

15   It's in a folder that I believe has the word 'RTL' in it.

16   They found it, they reviewed it, and I think just the only

17   confusion here is that Mr. Sheasby was looking for RTL for two

18   of the designs and there is none.

19           THE COURT:  What do you say to the argument that in

20   this case Micron did not produce its RTL code in the manner in

21   which it's used in an in-tact format?

22           MR. RUECKHEIM:  So I did hear that, Your Honor, from

23   Mr. Sheasby.  I did not see that in the briefing, so I'm not

24   sure it's a live issue for the Court.  But we collected the

25   material, we offered to have an employee there, and for most

1    of the case did have an employee there to help facilitate the

2    review; here's where what you're looking for is located.

3    There is no -- if Mr. Sheasby's alleging this--I'm not sure he

4    is--but there was no jumbling; this is production of source

5    code that Micron has that relates to the case.

6           THE COURT:  So your position is that Netlist has

7    seen the RTL code for two of the core dyes, but the other two

8    that are at issue do not have any RTL code?

9           MR. RUECKHEIM:  Correct, Your Honor.

10          THE COURT:  All right.

11          MR. SHEASBY:  So, Your Honor, here's the protective

12   order that requires the RTL to be produced in in-tact native

13   format in the structure and organization that it came from.

14   In Doctor Barr's first declaration he noted there was a morass

15   of disorganized files of RTL code without any identification

16   as to what they were.  There's millions of lines of RTL code.

17       Then after we filed our motion, in their opposition they

18   said, Why don't you go look at this link.  This link links to

19   a certain subset of RTL code which, once again, is disembodied

20   and incomplete, and ignores all the other RTL code that they

21   produced on the source code computer.

22       I don't know why they produced all those thousands --

23   millions of lines of RTL code on the source computer which

24   they say don't relate to anything, but it's been a wild goose

25   chase.

1          So what we just need is we just need something

2     definitive.  If they only have RTL code for two of the four

3     core dyes, we ask that they specifically produce that RTL code

4     in in-tact format and definitively tell us this is the RTL

5     code, because what we have is just no way of understanding

6     these files they are in such a disorganized state on the

7     computer.

8               THE COURT:  Do you accept the representation that I

9     just heard that for the other two of the four core dyes there

10    is no RTL code?

11              MR. SHEASBY:  Well, that's actually inaccurate.  So

12    for the other two of the four core dyes we did find RTL code,

13    we just -- it's just -- that RTL code is not in the pathway

14    they pointed to.  So that may be incomplete RTL code or maybe

15    RTL code that is not in its final form.

16         So we did find random RTL code for all four dyes, but

17    it's not in the path that they pointed to as the definitive

18    RTL code, which is why -- it is okay for them to have

19    incomplete RTL code--for example, if two of the core dyes have

20    not been fully designed--I totally get that.  What we just

21    need is an in-tact format, produce the RTL from the code

22    database so that it says this is the core dye and all the RTL

23    underneath it is present.  We can see exactly what stage it's

24    at, we can see exactly what -- how it's been changed and how

25    it's evolved.

1          And so if they produce the in-tact file structure for the

2     entire RTL for each of the four core dyes as they exist today,

3     this problem is resolved.  And I don't agree that this was a

4     new issue, and Mr. Barr -- in Doctor Barr's first declaration

5     he expressly speeches -- he expressly speaks about the fact

6     that there are 4 million lines of code that are randomly

7     collated.  This is in paragraph 2 of his declaration.  There

8     is millions of lines of code, and he expressly notes -- is

9     that in a standard code repository, providing us with an

10    in-tact tree of official RTL code would take just a few

11    minutes.  This is in paragraph 2 of his original declaration.

12         By the way, he actually did -- as an aside, there's 60

13    PDFs and PowerPoint files that are in the source code

14    repository that we've identified.  But that's an aside from

15    the last one because you had asked.

16         He talks about the fact that if they would just give us

17    the official in-tact tree of the RTL code as it exists for

18    each of the four dyes as opposed to these random folders that

19    are spread out or hidden in sub-folders, we can solve this

20    problem.

21              THE COURT:  I'm looking at his declaration, which is

22    in the record as Document 132-1.  Where is it that he

23    indicates that that can be quickly and easily done?

24              MR. SHEASBY:  The last sentence of paragraph 2.

25    "Using the standard code repositories that are employed

1    throughout the industry, providing Netlist with the in-tact

2    tree official RTL code would take a few minutes."

3         And I've seen this done.  In their code repositories, it

4    will have the name of the core dye and will have the complete

5    revision history of all the RTL for that core dye.  Instead,

6    they pulled random folders and said go look at this path,

7    don't look at this path, and it makes it impossible for us to

8    review.

9         THE COURT:  All right.  Thank you, Mr. Sheasby.

10        Mr. Rueckheim, do you have anything from your expert that

11   controverts the part of Doctor Barr's report that was just

12   referred to?

13        MR. RUECKHEIM:  I'm sorry, Your Honor.  Can you

14   state that one more time?

15        THE COURT:  The part of Doctor Barr's report that

16   Mr. Sheasby just read that says that providing an in-tact tree

17   official RTL code would take a few minutes, do you have

18   anything from your expert controverting that?

19        MR. RUECKHEIM:  So, no, Your Honor, we don't have

20   anything from our expert regarding this.  I think Mr. Sheasby

21   now is pointing to a declaration that was included as an

22   exhibit to the motion to change what he's asking for, and I

23   understood he was asking where is the authoritative RTL code

24   for the products at issue here and we told him.

25        Mr. Park here sitting to my left told Netlist reviewers

1   -- he was there in person and personally told them, This is

2   the folder, this is where the code's at.  I don't see what

3   -- how there could be a disagreement.  They know the folder.

4   The declaration submitted yesterday by the same expert -- so I

5   guess the answer to your question, Your Honor, is we do have

6   an expert; it's their expert, Doctor Barr -- Mr. Barr --

7   Doctor Barr.  He submitted a declaration exhibit yesterday

8   with the joint status report and said that he saw the RTL for

9   two of the accused designs here.  So they have it.

10      Mr. Sheasby then said, Well, what about the other two

11  designs; there's no RTL?  Mr. Sheasby said, Well, I saw RTL --

12  our expert, our reviewers saw RTL in other folders that

13  Netlist produced because this is how Netlist has the

14  information.  Show us.  But we've never had that conversation.

15  He's never come to us and said, Hey, Mike, I think we see some

16  RTL for the accused products here.  You are telling me there's

17  no RTL.  Let's have discussion.  Instead, he raises this

18  request.  He files a motion immediately, and now we're here

19  addressing it.

20          THE COURT:  I have the second declaration up now.

21  That's the one that's in the record at 152-3.  What part of it

22  are you referring to, Mr. Rueckheim?

23          MR. RUECKHEIM:  Paragraph 3 to start, Your Honor,

24  says that the code reviewer searched some of Micron's RTL

25  files.  He lists the pathway.  These were identified by

1    Micron's counsel.  And he inspected it and he says in

2    paragraph 4, second sentence, "For two of the dyes the Netlist

3    reviewer did not find RTLs."  There is no RTL for those two

4    dyes.  He says, "I understand Micron claims they do not have

5    RTL code," and then he says, "but the reviewer located some."

6        The problem is we got this declaration I think it was

7    midnight last night.  So if there's RTL -- if we're telling

8    the Court there is no RTL for these other dyes and their

9    reviewer is saying yes, there is, I'd like to resolve that and

10    have time to consider the issue.

11        THE COURT:  Well, I guess the request that I'm now

12    hearing is that Micron perform what Doctor Barr says will take

13    just a few minutes, and that is to give the RTL code in the

14    format that he described in his original declaration.

15        MR. RUECKHEIM:  So again, Your Honor, it may be just

16    some kind of lack of understanding probably on my part.  But

17    we've given Netlist the live code.  This is the actual code.

18    It's my understanding is whatever this tree is, it's there.

19    So if there is a certain software that Netlist has proposed

20    and it wants us to install it on the source code computer and

21    perform some tree action, I mean, I'm sure that would be fine,

22    if he said it's compatible with the live code.  But I -- we

23    told Netlist where the code is at and they reviewed it and

24    their expert said that.

25        THE COURT:  The expert said he had seen some, but he

1    did not -- I did not read that as him taking back what he said

2    in his original declaration.

3        So I am going to grant the motion to the extent that

4    Micron will be directed to perform what is described there in

5    paragraph 2 of Doctor Barr's original declaration, and I'll

6    set that out in the order.  And if you believe you have

7    complied with that, you can so certify.

8            MR. RUECKHEIM:  And just one point of clarification,

9    Your Honor.  I don't know how to do it.  I'm hopeful people at

10   Micron would.  They're much smarter than me.  But if Plaintiff

11   here has certain I guess software that it's hoping to generate

12   a specific result regarding a tree, we'd ask that Plaintiff

13   identify that and identify what information it's missing from

14   that code folder that the tree -- if the tree is there or not.

15   I think -- from what I've been told, it's there.

16           THE COURT:  I will also direct that Plaintiff use

17   its best efforts to assist in describing what that requires.

18           MR. RUECKHEIM:  Thank you, Your Honor.

19           THE COURT:  Is there anything else in this motion,

20   Mr. Sheasby?

21           MR. SHEASBY:  No, Your Honor.

22           THE COURT:  What's next, Mr. Sheasby?

23           MR. SHEASBY:  Docket 133.

24       Docket 133 I think is relatively simple.  Famous last

25   words.

1      The -- our interrogatory response for each of their

2   products requires -- an interrogatory request which they did

3   not refuse to answer or object to as to these two categories

4   is third-party components used and third-party component

5   suppliers.

6      So on their DRAM modules, they use RCD chips, they use

7   buffer chips, and they use PMIC chips from a number of

8   different suppliers.  For each of their product category,

9   for -- each of their product ID, it appears that there could

10  be multiple suppliers for the components.  They've represented

11  to us that they don't know -- they can't on a

12  product-by-product basis track what RCD -- within a product ID

13  name, they can't track what specific physical product will

14  have an RCD or PMIC or a buffer from Supplier X or Supplier Y.

15      And so what we've asked them to do is just to provide us

16  with the relative amounts of each of those components that

17  they receive from each of those third-party suppliers that

18  could be used in those products.  And that seems to us that

19  would resolve the issue.  And obviously they know how many of

20  those products they ordered from each of their suppliers.

21  That would just be an invoice.

22          THE COURT:  All right.  Go ahead, Mr. Rueckheim.

23          MR. RUECKHEIM:  Your Honor, Mike Rueckheim again.

24      I think the parties are close on this.  Netlist's motion

25  has substantially narrowed.  And Mr. Sheasby asked me today --

1    we actually met and conferred on Sunday night, and I think the

2    hurricane kind of interrupted travel plans, but we talked just

3    two nights ago on Sunday night where we discussed this issue

4    of whether production of sales information per component could

5    somehow be used to estimate or reflect what components go with

6    the end product, and that information is not tracked.

7         And so I think Micron is open, so I've told him that I

8    want to talk to Micron.  I just got this request on Sunday

9    night.  I think -- and I did talk to the guy.  I actually just

10   heard back.  But I think Micron's open.  We want to just

11   discuss with the stipulation could be that is fair, but I

12   think we can probably moot that, but we just need to have

13   further discussions.

14        THE COURT:  So what are you suggesting might be the

15   resolution?

16        MR. RUECKHEIM:  I think -- and Mr. Sheasby can

17   correct me if I'm wrong, but I think he's asking for some kind

18   of stipulation between the parties that production information

19   that Micron has regarding purchase of these certain products

20   at issue that--they're called third-party components, such as

21   RCDs, data buffers--whether Micron's purchase of these

22   components can reflect the distribution of suppliers used for

23   the actual accused products.  And so we need to, you know,

24   talk with the smart people at Micron to make sure that all

25   makes sense, the financial crew, but I think that's something

1    we can probably put to bed and have an agreement on.

2              THE COURT:  Well, is the reason there's some

3    question that some of these products might be used for accused

4    products and unaccused products?

5              MR. RUECKHEIM:  Correct, Your Honor.  It's -- I

6    think the main issue is Netlist has asked us to produce

7    documents showing the percentage of, let's say--Montage is a

8    supplier here--of Montage components within the accused

9    products versus another supplier, and we just don't have that

10   level of granularity.

11        But with respect to components we purchase from Montage,

12   we'll have a number there, we'll have the accused products,

13   and we can figure out some kind of way where it makes sense

14   that here is your distributed percentage of these third-party

15   components.  It really shouldn't relate to issues, I would

16   think, such as damages, because that's more just Micron's

17   accused product sales.  We're not looking -- I don't think

18   they're looking at these third-party components for that.  But

19   I think we can get the information together and very likely

20   come to some agreement.

21             THE COURT:  All right.  Thank you, Mr. Rueckheim.

22        Mr. Sheasby, are you at this point disputing the position

23   that Micron doesn't track that information on a

24   product-by-product basis?

25             MR. SHEASBY:  I'm not, Your Honor.  I take

1  Mr. Rueckheim's representation on that.  So what we --

2  the next step would be just to provide the number of those

3  components they order from each supplier.  We don't even need

4  a stipulation if they're not going to -- because I'd like to

5  get this resolved now.  And so if we just have the number of

6  components that are -- that they purchased from each of the

7  suppliers, that will give us the ratio that we need.

8           THE COURT:  So what we would be talking about there

9  is the number of components that Micron purchases, some of

10 which end up in the accused products, but not necessarily all

11 of which do.

12          MR. SHEASBY:  But we'll have a ratio and we think

13 that ratio will be reliable.

14          THE COURT:  All right.  Mr. Rueckheim, I understand

15 that you may be able to reach a stipulation that would avoid a

16 dispute down the road about this, but in terms of discovery,

17 is there any reason that Micron shouldn't produce those raw

18 numbers that Netlist is now seeking?

19          MR. RUECKHEIM:  No reason at all, Your Honor.  We've

20 already offered to produce those numbers.

21          THE COURT:  All right.  Well, then I'll just note

22 that Micron has agreed to produce the overall numbers of those

23 component products that it purchases from each of the relevant

24 manufacturers.

25          MR. RUECKHEIM:  Understood.

1              THE COURT:  All right.

2              MR. RUECKHEIM:  And I think the next one might be

3    me, Your Honor, but when you're ready.

4              THE COURT:  All right.  Go ahead, Mr. Rueckheim.

5              MR. RUECKHEIM:  So with respect to Micron's motion

6    to compel, Docket 135, micron is asking for production of a

7    limited subset of materials from Netlist's litigations with

8    SK hynix that was a few years ago.  I believe this limited

9    subset of materials would likely be in the 20- to 30-document

10   range, potentially.

11       We're looking for really -- it's set out in the joint

12   status report, but it's drafts of settlement agreements and

13   offers, expert reports, witness statements, and depo hearing

14   statements, transcripts in the pre- and post-trial briefing.

15       The relevance here, Your Honor, is that there is an

16   overlapping accused product and there's also patents that were

17   in the same family that Netlist is asserting here.  And we've

18   seen this just recently with respect to deposition of our

19   expert Doctor Stone.  Netlist's counsel put up materials that

20   Doctor Stone submitted in the Netlist/SK hynix litigation, and

21   there's issues overlapping there between, what Your Honor may

22   remember from the claim construction hearing, this fork in the

23   road idea, which is also at issue with respect to the SK hynix

24   allegations.  And so we think there's very significant

25   technical relevance here.

1        There's also relevance with respect to the settlement

2   agreements and offers here, because whether these patents

3   relate to RAND or FRAND obligations and whether Netlist, if

4   so, has breached their RAND or FRAND obligation can be

5   informed by these offers.  And so to the extent that Netlist

6   and SK hynix are discussing RAND issues or valuations for

7   portfolio versus specific license, these are all very relevant

8   to these RAND issues.

9        And so Netlist is countering on a relevance ground.  That

10  is simply just not tenable at this stage for discoverability.

11  We have narrowly tailored our request.  We're not seeking

12  everything in the SK hynix litigation, nor would I want to

13  review everything from the SK hynix litigation--that's a lot

14  of material.  We are seeking a very narrow amount of materials

15  here, and that is our request.

16       Thank you, Your Honor.

17            THE COURT:  Tell me, Mr. Rueckheim, what do you mean

18  by witness statements?

19            MR. RUECKHEIM:  There was an ITC case and a district

20  court case, and so we're looking at the witness statements in

21  the ITC; the affirmative presentation of testimony -- written

22  testimony to the ITC.

23            THE COURT:  All right.  Is it all from an ITC

24  proceeding, or was there a district court proceeding also?

25            MR. RUECKHEIM:  District court as well.

1          THE COURT:  All right.  Are any of the experts that

2     you're seeking the reports of also involved in the current

3     litigation?

4          MR. RUECKHEIM:  I believe so.  One in

5     particular--Doctor Stone, who I just mentioned.  I'm not

6     sure about the rest, Your Honor.

7          THE COURT:  All right.  How are you proposing that

8     third-party confidential information that was revealed

9     pursuant to a protective order in that matter should be

10    handled if any of that is produced in this litigation?

11         MR. RUECKHEIM:  I don't know if there is an issue

12    there, Your Honor.  We've asked for this material really since

13    the start of the litigation going back to at least January I

14    believe is mentioned in the briefing, and I don't know if

15    Netlist has had conversations with SK hynix as to whether they

16    can produce the information to Micron or if there is a concern

17    that needs to be addressed.

18         THE COURT:  Have you been provided the license that

19    ultimately issued in that case?

20         MR. RUECKHEIM:  Yes, we have.

21         THE COURT:  All right.  Why would the negotiating

22    documents be relevant, then?

23         MR. RUECKHEIM:  To inform the RAND question, whether

24    Netlist is offering Micron a reasonable and non-discriminatory

25    license with respect to the present case.  It would definitely

1   be informed based on how Netlist and SK hynix discuss the

2   licensing of individual patents versus a portfolio of patents

3   or what is actually the reasonable and non-discriminatory rate

4   here.

5          THE COURT:  I think that the Federal Circuit has

6   made it fairly clear that what FRAND is dealing with is what

7   the ultimate license contains, not what the parties'

8   negotiating positions were that got to that agreement.  I'm

9   not familiar with any Federal Circuit authority that would

10  indicate that a FRAND rate depends on the negotiation history

11  that led to it.  Are you?

12         MR. RUECKHEIM:  One second, Your Honor.

13                   (Pause in proceedings.)

14         MR. RUECKHEIM:  So I should have remembered this,

15  Your Honor, because I was actually involved in the case, but

16  it's cited on page 4 of our motion is the *Sol IP versus*--I was

17  representing Ericsson in the case--but *AT&T mobility*.  It's an

18  Eastern District of Texas case that granted a motion to compel

19  discovery on these license offers and proposals because they

20  were relevant to the RAND and FRAND issues there.

21         THE COURT:  All right.  And how would you say that

22  this case relates to the *Sol IP* case?

23         MR. RUECKHEIM:  There was less patents at issue in

24  this case.  Sol I think had somewhere -- about 20 patents

25  asserted.  But how it relates is really just the RAND issues.

1          THE COURT:  Well, for one thing, I think in that

2    case we were talking about licenses to the patents-in-suit and

3    offers that had been made to license the patents-in-suit.

4      Are the patents currently asserted in this case the same

5    patents as were involved in the SK hynix case?

6          MR. RUECKHEIM:  They are not, Your Honor.  They are

7    in the patent family, but they are covered under the portfolio

8    license that was granted, as is typical for patents and

9    continuations.

10          THE COURT:  Well, I can tell you they feel that, if

11    anything, I understand this law better than I did when I wrote

12    that opinion.  But in any event, do you have any other

13    authority on that?

14          MR. RUECKHEIM:  That is the authority we cited.

15    We'd like to see the materials, Your Honor, and I don't think

16    there is any burden -- there could be any burden argument here

17    because they can -- they can simply press a button and produce

18    it to us, but we'd like to see it.  And if there is a question

19    about admissibility or, you know, about 403 down the road, I

20    think we can deal with it at the MIL stage.  That's our

21    position, Your Honor.

22          THE COURT:  All right.  I think the concern that has

23    always deterred the Court from ordering the production of the

24    negotiations themselves is that doing that would chill

25    settlement negotiations in current cases if there was a

1     concern that those negotiations would become open for

2     discovery in future cases, and that's what I guess weighs

3     against the probative value.  And I just don't know what the

4     probative value of those negotiations would be when you have a

5     consummated license.

6            MR. RUECKHEIM:  It may address Your Honor's concern

7     if -- I just don't know.  Looking at these documents, I just

8     don't know whether they could relate to the RAND issues or

9     not, and so it may be -- it's just an in camera review process

10    or some other process that will make that determination as to

11    whether, you know, they would arguably relate to RAND.  And I

12    assume Netlist and Micron might disagree on what that means,

13    but if there's a way to mechanic that in order to address that

14    concern, that would be my only suggestion.

15           THE COURT:  All right.

16           MR. RUECKHEIM:  Thank you, Your Honor.

17           THE COURT:  Thank you.

18           MR. SHEASBY:  Your Honor, I'll start with the issue

19    of the settlement negotiations.  The patents that were

20    asserted against SK hynix were not the patents at issue in

21    this case.  Micron has not offered to provide any of its

22    negotiation records for any of its license agreements.  There

23    is no claim of breach of a FRAND obligation live in this case,

24    and I -- and we would respectfully submit that it is

25    pernicious from a public policy standpoint to produce

 1    negotiation materials when there's a final consummated

 2    agreement.  If there wasn't a final consummated agreement, I

 3    would understand why a different approach may be necessary,

 4    but in this case there was.

 5        As to the SK hynix ITC materials, the patents-at-suit in

 6    this case were not the patents-in-suit in this case.  They are

 7    correct that there was one overlapping expert that is actually

 8    their expert.  Mr. Stone was adverse to Netlist in the

 9    SK hynix cases, and he is also adverse to Netlist in these

10    cases.

11        So the only expert that we have in this case -- none of

12    Netlist's experts from this case were Netlist's experts in the

13    -- I believe in the SK hynix cases.  At least not on -- there

14    may be one exception to that, but that person, previous

15    expert, was not dealing -- it's Doctor Brogioli.  But Doctor

16    Brogioli would be dealing with HBM patents, and his previous

17    work with us did not relate to HBM patents.

18        We do believe that there is some scope of appropriate

19    production from SK hynix.  What we have agreed to produce and

20    what was acceptable in the *Netlist versus Samsung* case was the

21    witness statements, trial testimony, and deposition of our

22    corporate officers, which was CK Hong, Gail Sasaki, and JB

23    Kim, as well as the trial statements and deposition testimony

24    of our inventors.  That would give them the factual

25    information as opposed to SK hynix specific information or

1    third-party supplier specific information, and it would allow

2    them to make sure that witnesses in this case were not saying

3    inconsistent things with what was said in the last case.

4         But claim construction briefing and expert analysis of

5    infringement on completely different products and patents that

6    have different claims, that is far too afield.  And we,

7    frankly, do not want to go through the process of having to

8    redact out all the confidential information for what would

9    seem to be a limited -- a limited probative value given that

10   there is different patents.

11        So the short answer is they are entitled to something.

12   We've already acknowledged they are entitled to something.  We

13   offered to give them the same thing that was provided

14   acceptably in the *Netlist versus Samsung* case which relates to

15   these same patents, and none of the our experts in this case

16   will -- were experts in the previous case for us testifying on

17   the same subject.

18             THE COURT:  Well, I don't believe that under the

19   law statements by experts are admissible in other proceedings

20   against the party that retained them, so I have never taken

21   the position that expert reports from other litigation need to

22   be provided in discovery.  In this case, since there is an

23   overlapping expert, I do believe that any report by -- is it

24   Doctor Stone?

25             MR. SHEASBY:  It is, Your Honor.

1         THE COURT:  From the hynix -- SK hynix litigation

2    should be provided to Micron in this litigation.  I will deny

3    the request for the settlement negotiations as long as the

4    consummated settlement license agreement has been produced.  I

5    agree that any witness statements--and by that I'm referring

6    to declarations that were offered to the tribunal as opposed

7    to internal work product of the lawyers--any witness

8    statements from Netlist certainly.  Were there other witness

9    statements from individuals other than those representing

10   Netlist that were offered?

11        MR. SHEASBY:  There were an immense number of

12   witness statements in the proceedings.  I think there were

13   three ITC proceedings.  That's why the three core witnesses,

14   the three corporate officers and the inventors was what we had

15   produced last time.  I don't know what other witness

16   statements there are -- there were.

17        THE COURT:  Well, I will require that Netlist

18   provide to Micron a list of the witness statements that are

19   being withheld.

20        MR. SHEASBY:  Yes, sir.

21        THE COURT:  And if Micron can show a need for those,

22   then I'm open to considering that request.  Deposition

23   transcripts, the same thing--it will be as to the

24   representatives of Netlist and a list of the others that are

25   not provided.

1            Is the briefing all sealed?

2                  MR. SHEASBY:  It is.

3                  THE COURT:  And is that because of third-party

4     information or something else?

5                  MR. SHEASBY:  It's all sealed because of SK hynix

6     confidential information and third-party confidential

7     information because the third parties used the -- like Micron,

8     SK hynix used third parties for the chips they put on their

9     modules.  So the vast majority of the sealing will actually be

10    third-party confidential information.

11                 THE COURT:  Well, all right.  Then thank you,

12    Mr. Sheasby.

13          Mr. Rueckheim, if you want parts of the record from that

14    proceeding that are sealed, I think that's a request you'll

15    have to make to the tribunal that sealed them.

16                 MR. RUECKHEIM:  Understand, Your Honor.

17          One point of clarification.  I think Mr. Sheasby also

18    -- Your Honor ordered production of reports and I assume

19    deposition testimony by Doctor Stone.

20          Mr. Sheasby also mentioned an expert Doctor Brogioli--and

21    I'm sure I'm pronouncing that wrong--that is at issue in the

22    prior litigation and at issue in this litigation.  And so we

23    would just make sure Your Honor understood that in making his

24    order.  And we'd also ask, unless Your Honor's already

25    considered it, if there are any experts that opined on the

1    same overlapping accused product here, the DDR4 LRDIMM or any

2    of the patents in the same family at the asserted patents.  If

3    Netlist used these experts to characterize its invention in

4    one way in that proceeding and its current experts are

5    characterizing different proceedings, we'd love to see that,

6    too.

7            THE COURT:  Why would statements by those experts be

8    controlling on Netlist?

9            MR. RUECKHEIM:  Netlist put up these experts as

10   their agent, Your Honor, in my opinion.  So if they were

11   offering this testimony as Netlist's position to one tribunal,

12   and then they tried to hire different experts for this

13   tribunal to offer a different position I think is very fair

14   game to me -- for me to ask their expert didn't Netlist say

15   the opposite in a prior litigation?  How does that affect your

16   opinion now?

17           THE COURT:  Well, two things.  One, let me note,

18   you're saying there is a second expert that is common to the

19   two cases?

20           MR. RUECKHEIM:  Correct.  I think the name is Doctor

21   Brogioli.  And I have no way of spelling that.  I'm sorry.

22           THE COURT:  All right.  I'll include that doctor in

23   this.  As to other experts, it's never been my impression of

24   the law that the opinion of an expert is binding on the party

25   in a different case, but I'll take a look at that and see if

1    that has changed.

2             MR. RUECKHEIM:  Understood, Your Honor.  Thank you,

3    Your Honor.

4             THE COURT:  All right.  Then I will include that in

5    the order.

6         Anything else on this motion, Mr. Rueckheim?

7             MR. RUECKHEIM:  No, Your Honor.

8             THE COURT:  All right.  Mr. Sheasby, what about you?

9             MR. SHEASBY:  No, Your Honor.  That concludes all

10   scheduled motions for today, and Netlist thanks you.

11            THE COURT:  There is another motion, and I think the

12   briefing on it is perhaps still going on.  Is that something

13   that either side thinks it would be helpful to take up today?

14            MR. SHEASBY:  We don't, Your Honor.  There is two

15   other motions pending.  There was one of them the briefing has

16   not been completed.  It's a motion to enforce Your Honor's

17   previously -- previous ruling on financial information and

18   qualification information.  That briefing has not been

19   completed.

20        There is also just been a brief that was filed on Monday.

21   Statements were made in that brief that I think may moot the

22   motion.  We just need to meet and confer with them on that.

23            THE COURT:  All right.  Well, I will set a hearing

24   on the additional motions in due course, then.

25            MR. SHEASBY:  Thank you for your time, Your Honor.

1          MR. RUECKHEIM:  Thank you, Your Honor.

2          THE COURT:  All right.  Thank you.

3     And we're adjourned.

4                    (End of hearing.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   I HEREBY CERTIFY THAT THE FOREGOING IS A

2                  CORRECT TRANSCRIPT FROM THE RECORD OF

3                  PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4                  I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5                  FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6                  COURT AND THE JUDICIAL CONFERENCE OF THE

7                  UNITED STATES.

8

9                  S/Shawn McRoberts           08/24/2023

10               _____DATE_____
                  SHAWN McROBERTS, RMR, CRR

11               FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25