# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| NETLIST, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:22-cv-203-JRG |
| vs. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MICRON TECHNOLOGY, INC.; | ) | ▆▆▆▆▆▆▆▆ |
| MICRON SEMICONDUCTOR | ) | |
| PRODUCTS, INC.; MICRON | ) | |
| TECHNOLOGY TEXAS LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF NETLIST'S MOTION FOR AN ORDER TO SHOW CAUSE WHY EVIDENTIARY SANCTIONS RELATING TO THE '060 AND '160 PATENTS SHOULD NOT BE ISSUED ON DEFENDANTS

# TABLE OF CONTENTS

**Page**

I.   Factual Background ................................................................................................. 1

    A.   Micron Has Executed a Concerted Strategy of Withholding
        Production of Information Required by P.R. 4-3 ....................................... 1

        1.   Refusal to Produce HBM Technical Documents. ...................................... 1

        2.   Interference with Netlist's Source Code Review. ...................................... 2

        3.   Failure to Identify the Complete, Authoritative Path of RTL
            Code .............................................................................................................. 2

        4.   Improperly Designated Source Code Materials. ....................................... 2

        5.   Intentional Delay in the Production of Requested Printouts ................. 5

        6.   Refusal to Provide Witnesses Knowledgeable on HBM
            Design .......................................................................................................... 6

    B.   Withheld Information Required by P.R. 3-4 ............................................... 6

        1.   Die Interconnection .................................................................................... 6

        2.   Driver Size Configuration ........................................................................ 10

II.  Argument ................................................................................................................ 11

III. Conclusion .............................................................................................................. 14

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Atlas Glob. Techs. LLC v. TP-Link Techs. Co.*,
    2023 WL 4936210 (E.D. Tex. Aug. 2, 2023) ................................................................... 15

*Chamberlain Grp. LLC v. Overhead Door Corp.*,
    No. 21-cv-0084, Dkt. 386 (E.D. Tex. Mar. 30, 2022) ..................................................... 13

*ClearValue, Inc. v. Pearl Polymers, Inc.*,
    560 F.3d 1291 (Fed. Cir. 2009) ...................................................................................... 13

*Denman Springs, LLC v. L.G. Burke, Inc.*,
    2021 WL 2794697 (E.D. Tex. Apr. 20, 2021) ................................................................. 15

*Guidry v. Cont'l Oil Co.*,
    640 F.2d 523 (5th Cir. 1981) .......................................................................................... 13

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co., Ltd.*,
    259 F. Supp. 3d 530 (E.D. Tex. 2017) ........................................................................... 13

*Kamatani v. Benq Corp.*,
    2005 WL 2455825 (E.D. Tex. Oct. 4, 2005) ................................................................... 15

*Positive Software Sols. v. New Century Mortg. Corp.*,
    619 F.3d 458 (5th Cir. 2010) .......................................................................................... 13

*Pressey v. Patterson*,
    898 F.2d 1018 (5th Cir. 1990) ........................................................................................ 13

*Roadway Express, Inc. v. Piper*,
    447 U.S. 752 (1980) ....................................................................................................... 13

**Rules**

Fed. R. Civ. P. 37(b)(2)(A), (C) ................................................................................................ 13

Plaintiff Netlist respectfully moves for an order to require Micron Defendants to show cause why evidentiary sanctions should not be issued against Micron to prevent it from disputing infringement as to the elements of the '060 and '160 Patents reciting:

(1) "the first die interconnect(s) in electrical communication with the first group of array dies and not in electrical communication with the second group of at least one array die, the second die interconnect(s) in electrical communication with the second group of at least one array die and not in electrical communication with the first group of array dies"; and

(2) "the second driver size being different from the first driver size."[1]

This sanction is necessary due to Micron's failure to comply with Patent Rule 3-4 and to provide the documentation sufficient to determine whether these limitations are met.

# I.   **FACTUAL BACKGROUND**

Netlist asserts patent infringement claims against Micron for making, using, selling, offering for sale in the United States and importing into the United States HBM products, including HBM2E and HBM3.  Under the DCO, by November 21, 2022, Micron was required to "produce or make available for inspection and copying: . . . [s]ource code, specifications, schematics, flow charts, artwork, formulas, or other documentation sufficient to show the operation of any aspects or elements of an Accused Instrumentality identified by the patent claimant in its P. R. 3-1(c) chart." Dkt. 43 (DCO); *see also* P.R. 3-4(a).

## A.   **Micron Has Executed a Concerted Strategy of Withholding Production of Information Required by P.R. 4-3.**

### 1.   **Refusal to Produce HBM Technical Documents.**

On November 21, 2022, Micron failed to produce technical documents regarding its HBM products because "Micron claims that it does not need to produce the required documents

---

[1] These elements are referenced in at least the asserted claims 1, 11, 20, and 21 of the '060 patent and other dependent claims; and claims 1 and 5 of the '160 patent and other dependent claims.

because it believes it does not infringe the '060 and '160 patents." Dkt. 49; Dkt. 49-2. After Micron's repeated refusal to provide the relevant documents, Netlist moved to compel, and only after that did Micron agree to produce documents for HBM products and make them available on source code machine for review on May 22. Dkt. 81.

### 2. Interference with Netlist's Source Code Review.

After the entrance of the stipulation in May, Netlist promptly reviewed Micron's HBM code. However, Micron insisted on having its own employees control the source code review computer when the software program from Cadence was used for review, making it impossible to efficiently review the code. On May 31, Netlist moved to modify the protective order to stop Micron from doing so. On June 11, the Court ordered Micron to "make its relevant source code available for inspection without any active participation by its employees between the inspecting representatives of Netlist and the source code computer." Dkt. 99. Micron did not comply the Court's order or make software properly available until July.

### 3. Failure to Identify the Complete, Authoritative Path of RTL Code.

After Netlist resumed review of the source code in July, a series of new issues came up. Critically, Netlist's reviewers could not find the specific path of Micron's complete, authoritative RTL Code. Instead, Netlist's reviewers were directed to ███████████████████ ██████████████████████████████████████████ Dkt. 132. Netlist had to move the Court to compel Micron to specify the directories that hold the original, authentic copies of the RTL code on August 1, 2023. *Id.* The Court ordered Micron to comply during the August 22 hearing and in its formal Order entered on August 29. Dkt. 158 at 2 (ordering Micron to provide "Netlist with the intact tree of official RTL code"). Micron refused to comply with this order or otherwise provide Netlist with further explanation as to the RTL location. As such, Netlist's source code reviewer is still facing significant challenges in conducting the review.

### 4. Improperly Designated Source Code Materials.

During Netlist's review, over 60 PDF, PowerPoint, and Excel files were identified by Netlist as improperly designated as source code. Some include JEDEC specifications and Micron technical documents it contends have been produced during discovery.

Netlist had to move the Court for an order to compel. On August 29, the Court ordered Micron to produce the entire files without those pages counting toward the page limit of source code review. Dkt. 158. Although the Court anticipated that 500 pages would be sufficient, Dkt. 158, Micron's production of these documents runs over 3,000 pages, and it appears still to be incomplete. Based on gaps in the documents' internal pagination, 351 pages appear to be missing from within those documents. Netlist has also discovered that the documents hyperlink to other documents that appear not to have been produced. ██████████████████████ ██████████████████████); *see also* Ex. 7 (2023-09-15 Werner Email) (identifying the missing pages and gaps of Micron's source code production).

Based on the Court's order which required production, it is apparent that Micron was using the source code designation to improperly hide material information. For example, Micron redacted a screenshot of a PowerPoint block diagram. This diagram is clearly labeled as a "concept," not an actual design:

**Redacted:**





**Unredacted:**

As another example, Micron redacted the name column of a screenshot in a web page of an Excel file listing signals that go from one chip to another.



**Unredacted:**



### 5. Intentional Delay in the Production of Requested Printouts

Throughout Netlist's review of Micron's source code, the reviewer has consistently requested printouts from Micron pursuant to the Protective Order. However, Micron completely ignored the deadline for delivery of the printouts. For example, Netlist's counsel requested printing of certain schematics as well as the non-source code documents on August 16, 2023.[2] Micron failed to timely produce printouts until August 29, which was a full week after the deadline specified in the Protective Order. *See* Ex. 4.  The first set of materials Micron improperly designated as source code and which the Court ordered produced were not sent out to Netlist ***until September 5,*** 14 days after the hearing at which the Court ordered this to occur. Ex. 5 (Micron service email regarding source code printouts).

---

[2] The requests also include those improperly designated materials discussed above; and at the time, Micron counsel also agreed to redact what it contends to be source-code material from the non-source code files and produce the redacted files. Micron counsel then reneged on that agreement, only to finally produce those documents weeks later.

Netlist's code reviewer also asked for printouts on August 25, August 30, August 31, September 12, September 13, but these have all been ignored.  Netlist later discovered that Micron incorrectly told Netlist's reviewer that his multiple print requests, dating back to August 25, were being produced "automatically," despite the fact that Micron has been completely ignoring them. *See* Ex. 8 (09-15 Werner Email) ("Attached is an updated print request form. It lists all of the same prints. It just adds the date on which the each print was requested. Our reviewer just clarified to me that he has been making print requests to Kasper each day"); Ex. 9 (attachment).

### 6. Refusal to Provide Witnesses Knowledgeable on HBM Design

While resisting document production and source code review, Micron also made it impossible for Netlist to conduct depositions of Micron's HBM engineers. Micron identified only one individual whom it would make available on its HBM designs—Mr. Royer.  Micron offered him at two times: August 24, before Micron had produced the critical design information Netlist had been requesting; and then again on September 19 or 20, the very last two days of fact discovery, with expert reports due on the same date. Because of this, on August 31, Netlist identified and properly noticed for deposition four Micron employees each with technical knowledge regarding the HBM design. Micron refused to make any of them available and moved for a wholly improper protective order, which blocks discovery of the missing design information.

### B. Withheld Information Required by P.R. 3-4

### 1. Die Interconnection

After close to a year of repeated motion practice, Micron is still withholding critical information relating to its accused HBM2E products and HBM3 products.  Specifically, Netlist identified the following information that is still missing:

███████████████████████████████████████
██████████████████████████████

Ex. 6 (2023-09-12 Sheasby Email).

This information is directly relevant to Netlist's infringement claims relating to the '060 and '160 patents.  For example, the claims require two sets of die interconnects, with "the first die interconnect(s) in electrical communication with [a] first group of array dies and not in electrical communication with the second group of at least one array die" and "the second die interconnect(s) in electrical communication with the second group of at least one array die and not in electrical communication with the first group of array dies." *See, e.g.*, Dkt. 5-6 at 24 (Cl. 1 of the 160 patent); Dkt. 5-5 at 24 (Cl. 1 of the 060 patent).

Netlist has repeatedly requested information showing the "configuration and interconnections of the die interconnects (e.g. TSVs) in Micron's accused HBM products. For example, Requests No. 68, 70, 71, 117 of Netlist's November 10, 2022 discovery letter directed specifically to such information:

> 68. Documents sufficient to fully describe the HBM layout, interconnections, and signaling in Micron Accused HBM Products, including, but not limited, to documents related to: . . . (4) how Micron Accused HBM Products electrically isolate or reduce the load presented by the die interconnects (e.g., TSVs). . . Such documents include, but are not limited to, circuit diagrams, design files, Source Code, application notes, specifications, datasheets, descriptions of operation principles, functional block diagrams, and presentations of the relevant integrated circuits and components.

> 70. Documents sufficient to fully describe all testing (and results of that testing) Micron did or commissioned others to do to ensure proper communication of data, control, and address signals to the control die (e.g., buffer die or logic die) and the DRAM dies in Micron Accused HBM Products.

> 71. All Documents relating to the die interconnects' interconnections in 4-stack HBM2/HBM2E/HMB3s versus 8- and 12-stack HBM2/HBM2E/HBM3s versus 16-stack HBM3s.

> 117. Studies and evaluations performed by Micron or third parties on whether TSVs for signals should be selectively connected to only selected drivers in a selected subset of DRAM chips or to be connected to all DRAM chips.

Ex. 1 (2022-11-10 Zhao Ltr.) at 11, 12, 17.

On April 29, 2023, Netlist sent a letter to Micron, explaining that "the manner of interconnection of the die interconnects in Micron's HBM Products, *e.g.* how the TSVs are arranged, is plainly relevant to the asserted claims," and pointed out:

> Netlist has repeatedly asked Micron to remedy these deficiencies in its document production. *See, e.g.*, 2023-03-08 Werner Ltr. to Rueckheim (noting Micron "has failed to produce technical documents" regarding its HBM products). Netlist also filed a motion to find Micron in violation of P.R. 3-4(a) when it became clear that Micron would continue to refuse to produce technical documents regarding its HBM products. Dkt. 49 at 1-2. However, to date Micron has only produced 14 documents evidencing the operation of its HBM products as part of its P.R. 3-4 production. As summarized in the table below, many of these documents are publicly available, or materially identical to publicly available documents. These documents are insufficient to show the pattern of die interconnection in Micron's HBM products, which, as explained above, is highly relevant to Netlist's infringement theory for the '060/'160 patents. Nor do those documents provide sufficient information on the buffer die layout or signaling protocols relevant to *e.g.*, whether the accused products feature a "control die . . . comprising a control circuit to control respective states of the first data conduit and the second data conduit in response to control signals received via one or more second terminals of the plurality of terminals." '060, cl. 1. . . .

Ex. 2 (2023-04-29 Tezyan Ltr).  Subsequently, Netlist asked Micron to produce:

> Documents related to Micron's decisions to use different interconnect structures in HBM2E and HBM3 (1st and 2nd Generations), including alternatives considered, modelings performed, references consulted, and the reasons for changing the TSV interconnect structures.  RFPs #68, 70, 71, 117.

Ex. 3 (2023-07-31 Tezyan Email); *Id.* (2023-08-08 Tezyan Email).

Micron refused to supplement its production. Micron's counsel first claimed "



Ex. 6 (2023-09-13 Park Email). Netlist's counsel explained that this is wrong and that

Netlist requested that "[i]f you believe otherwise point to the document and explain why." *Id.* (2023-09-13 Sheasby Email to Park). Micron refused to do so, necessitating this motion. Instead, Micron taunted Netlist, stating "we

can do it and we are not going to tell you how to do it" at the parties' meet and confer on September 14, 2023.

To be clear, Netlist has diligently reviewed Micron's production.  As background, the accused HBM chips are constructed of a stack of integrated circuits with wiring added that connects them.[3]



████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████. Micron's technical production does, however, show that in some instances, the wiring between the dies can be omitted or cut.



██████████████████.  Micron is aware that this is a critical infringement issue. Micron's counsel stated: "We decline your demands that Micron divulge its expert analysis. It is Netlist's burden to prove infringement, not Micron's."  Ex. 10 at 1 (2023-09-14 Park Email).  Netlist does

---

[3] https://imageio.forbes.com/specials-images/imageserve/64c109508a969cb33a264b18/Micron-HBM3-Memory-Stack/960x0.jpg.

not want expert analysis. It wants to know where the required documentation is. Micron has refused to provide that information.

In response to Netlist's inquiries, Micron claimed that it had produced all necessary signal tracing evidence, and refused to provide any further information, asserting expert work product protection.  When the parties' lead and local counsel met and conferred on September 14, at the urging of Micron's lead counsel, Micron agreed to convene a discussion of technical attorneys and consultants to discuss what specific signal tracing evidence Micron claims it has provided.  Micron has not responded to Netlist's repeated follow-up emails regarding that discussion, nor has Micron otherwise identified any specific signal tracing evidence. Ex. 6 at 1.

### 2.    Driver Size Configuration

The asserted claims of the '060 and '160 patents recite "a first driver size," "a second driver size" and "the second driver size being different from the first driver size."  Netlist has repeatedly informed Micron that it has not produced design information on its drivers.  *See, e.g.*, Dkt. 74 at 8 (seeking motion to compel Micron to produce technical documents "regarding key features of Micron's HBMs" including "the control of driver sizes").  After spending significant amounts of time reviewing Micron's source code materials, Netlist asked Micron again for documents sufficient to disclose ███████████████████████████████████████

████████████████████████████████████████████████████████Ex. 6 (2023-09-12 Sheasby Email).

Micron responded by stating ███████████████████████████████████████

██████████████████████████████████████████Ex. 6 (2023-09-13 Park). This statement is demonstrably incorrect. For example, ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

## II.    ARGUMENT

Federal Rule of Civil Procedure 37 authorizes the Court to issue sanctions for a party's failure to comply with discovery orders. See Fed. R. Civ. P. 37(b)(2)(A), (C). "Rule 37 sanctions must be applied diligently both 'to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763–64 (1980) (alteration in original) (citation omitted). Further, "[the] decision to sanction a litigant pursuant to [Rule] 37 is one that is not unique to patent law," so regional circuit law applies to the dispute. *ClearValue, Inc. v. Pearl Polymers, Inc.*, 560 F.3d 1291, 1304 (Fed. Cir. 2009).

In the Fifth Circuit, "[t]he sanctions available under Rule 37 are flexible, and the court has the authority to apply them in many varied forms, depending on the facts of each case. 'Rule 37 only requires the sanction the Court imposes hold the scales of justice even.'" *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co., Ltd.*, 259 F. Supp. 3d 530, 552 (E.D. Tex. 2017) (quoting *Guidry v. Cont'l Oil Co.*, 640 F.2d 523, 533 (5th Cir. 1981)).

The Court also possesses inherent authority to impose sanctions "in order to control the litigation before it." *Positive Software Sols. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010) (quotation omitted). The Court may use its inherent authority to sanction conduct that is "in direct defiance of the sanctioning court" or constitutes "disobedience to the orders of the Judiciary." *Id.* The most severe sanctions require a finding of bad faith or willful misconduct. *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990). "Bad faith is characterized by conduct that is either intentionally or in reckless disregard of a party's obligation. . . ." *See Chamberlain Grp. LLC v. Overhead Door Corp.*, No. 21-cv-0084, Dkt. 386 (E.D. Tex. Mar. 30, 2022) (cites omitted).

Netlist requests that this Court enter the follow evidentiary sanction: Micron may not dispute infringement of the following limitations: (1) "the first die interconnect(s) in electrical communication with the first group of array dies and not in electrical communication with the second group of at least one array die, the second die interconnect(s) in electrical communication with the second group of at least one array die and not in electrical communication with the first group of array dies"; (2) "the second driver size being different from the first driver size."

This sanction is narrowly tailored to the specific claim element at issue and to the specific prejudice Netlist incurred due to Micron's failure to comply with P.R. 3-4. *Supra* at 1-8. Micron's refusal to provide information ███████████████████████████ is a violation of P.R. 3-4, which requires the production of information sufficient to show the operation of any aspects or elements of an Accused Instrumentality identified by Netlist in its infringement contentions. This exact issue is identified in the infringement contentions:

**Exhibit E - Infringement of U.S. Patent 8,787,060**

| (1c) at least a first die interconnect and a second die interconnect, the first die interconnect in electrical communication with the first group of array dies and not in electrical communication with the second group of at least one array die, the second die interconnect in electrical communication with the second group of at least one array die and not in electrical communication with the first group of array dies; and | The Accused Instrumentalities further comprise at least a first die interconnect and a second die interconnect, the first die interconnect in electrical communication with the first group of array dies and not in electrical communication with the second group of at least one array die, the second die interconnect in electrical communication with the second group of at least one array die and not in electrical communication with the first group of array dies.<br><br>For example, a first die interconnect may be in electrical communication with the first group of array dies (*e.g.*, (i) two or more of the bottom DRAM dies or (ii) a set of dies communicating through a same (first) data channel or data channels, such as dies 1 and 5 (colored in red), dies 2 and 6 (colored in green), dies 3 and 7 (colored in yellow), and dies 4 and 8 (colored in orange)) and not in electrical communication with the second group of at least one array die (*e.g.*, (i) at least one of the top DRAM dies or (ii) another set of dies communicating through a second data channel), and the second die interconnect may be in electrical communication with the second group of at least one array die and not in electrical communication with the first group of array dies. On information and belief, this is achieved by coupling certain TSVs with active transceiver logic for only a subset of the dies.  For example, some TSVs electrically interconnect only the first group of DRAM dies with the underlying control die (labeled as both a "buffer die" or "logic die" above) while some bypass these same first group of DRAM dies and electrically connect with the active transceiver logic of only the second group of DRAM dies. For instance, in one implementation, a first set of TSVs interconnect is in electrical communication with only dies 1 and 5 (colored in red), but not in electrical communication with dies 4 and 8 (colored in orange), dies 3 and 7 (colored in yellow), or dies 2 and 6 (colored in green) (each pair can be a second group of array dies).  A second set of TSVs interconnect is in electrical communication with dies 4 and 8, for example, but are not in electrical communication with dies 1 and 5 (or with dies 2 and 6 or dies 3 and 7).  As another example, some transceiver logic in certain array dies is disabled though programming steps.  As an additional example, changes in metallization patterning, via patterning, via interconnection patterns, configuration and programming (including design-time, manufacturing-time, test-time, training-time, and run-time), or any other mechanism to create a physical or logical open circuit causes electrical signals to be received at a subset of array dies. |

Exhibit F - Infringement of U.S. Patent 9,318,160

| Claim 1 | Evidence of Use |
|---|---|
| **(1d)** a control die comprising first data conduits between the first die interconnects and the data terminals, and second data conduits between the second die interconnects and the data terminals, the first data conduit including first drivers each having a first driver size and configured to drive a data signal from a corresponding data terminal to the first group of array dies, the second data conduit including second drivers having a second driver size and configured to drive a data signal from a corresponding data terminal to the second group of at least one array die, the second driver size being different from the first driver size. | The Accused Instrumentalities further comprise a control die comprising first data conduits between the first die interconnects and the data terminals, and second data conduits between the second die interconnects and the data terminals, the first data conduit including first drivers each having a first driver size and configured to drive a data signal from a corresponding data terminal to the first group of array dies, the second data conduit including second drivers each having a second driver size and configured to drive a data signal from a corresponding data terminal to the second group of at least one array die, the second driver size being different from the first driver size. |
| | The Accused Instrumentalities also include a control die, *e.g.*, at the bottom of the memory package (i.e. the "logic die," "base die," or "interface die"), which is vertically interconnected by TSVs and associated bumps and bond pads to the corresponding array dies. |
| | On information and belief, the control die further includes first data conduits between the first die interconnects and the data terminals, and second data conduits between the second die interconnects and the data terminals. The data conduit further includes first drivers each having a first driver size and configured to drive a data signal from a corresponding data terminal to the first group of array dies; and the second data conduit include second drivers each having a second driver size and configured to drive a data signal from a corresponding data terminal to the second group of at least one array die. For example, the second driver size may be different from the first driver size to account for the different distances data signals have to travel. For instance, signals traveling to the bottom red die would have less distance to travel than signals traveling to either of the orange dies; and signals traveling to the top red die would have less distance to travel than signals to the top orange die. As a further example, the driver circuitry comprises multiple transmitters, repeaters, and other circuitry. As a further example, the driver circuitry contains redundancy test and repair circuitry. This circuitry is reprogrammed, though physical and logical reprogramming during design, manufacturing, test, self-test, and operation, to operate at a different physical and logical driver size. |

Thus, finding the specific elements are met is an appropriate evidentiary sanction. *See e.g.*, *Atlas Glob. Techs. LLC v. TP-Link Techs. Co.*, 2023 WL 4936210, at *4 (E.D. Tex. Aug. 2, 2023) ("**GRANTS** the motion such that the sales figures in the IDC reports relied upon by Plaintiff's expert shall be deemed established and may not be attacked by Defendants"); *Denman Springs, LLC v. L.G. Burke, Inc.*, 2021 WL 2794697, at *2 (E.D. Tex. Apr. 20, 2021) (because the defendants failed to comply with the Court's order for document production, holding "it will be taken as established" that defendants "failed to pay the vendors mentioned in Request Numbers 4, 7, 10, 13, 16, 19, and 22").

Further, Micron's discovery misbehavior, as detailed in **Section I**, demonstrates its bad faith in delaying to provide relevant documents and witness depositions for Netlist to conduct sufficient examination with respect to the above topics. *See Kamatani v. Benq Corp.*, 2005 WL 2455825, at *15 (E.D. Tex. Oct. 4, 2005) (striking defense upon finding defendant's conduct

"demonstrate[d] a conscious intent to evade the discovery orders of the Court"). Because even a more severe sanction would be appropriate in this context, Netlist's motion for an evidentiary sanction is justified.

## III.  **CONCLUSION**

For reasons discussed above, Netlist's motion for a show cause order should be granted.

Dated: September 16, 2023

Respectfully submitted,

*/s/ Jason G. Sheasby*

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Jason G. Sheasby (*pro hac vice*)
jsheasby@irell.com
Annita Zhong, Ph.D. (*pro hac vice*)
hzhong@irell.com
Thomas C. Werner (*pro hac vice*)
twerner@irell.com
Yanan Zhao (*pro hac vice*)
yzhao@irell.com
Michael W. Tezyan (*pro hac vice*)
mtezyan@irell.com

**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199

***Attorneys for Plaintiff Netlist, Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served on all counsel of record by email.

/s/ Yanan Zhao
Yanan Zhao

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I hereby certify that the foregoing document and exhibits attached hereto are authorized to be filed under seal pursuant to the Protective Order entered in this Case.

/s/ Yanan Zhao
Yanan Zhao

**CERTIFICATE OF CONFERENCE**

I hereby certify that the parties' lead and local counsel met and conferred on September 14, 2023.  Micron's counsel stated that it objected to the above referenced requests.

/s/ Yanan Zhao
Yanan Zhao