**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| NETLIST, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:22-CV-203-JRG |
| vs. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MICRON TECHNOLOGY, INC., | ) | |
| MICRON SEMICONDUCTOR | ) | ██████████████ |
| PRODUCTS INC., MICRON | ) | |
| TECHNOLOGY TEXAS LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF NETLIST, INC.'S MOTION TO STRIKE OPINIONS OF DR.
MATTHEW LYNDE**

## TABLE OF CONTENTS

**Page**

I.     Dr. Lynde's Comparable License Analysis ..................................................................1

    A.     Dr. Lynde Assigns the Same Value to Every Patent ......................................1

    B.     Dr. Lynde Provides an Improper Legal Interpretation of the MFL Clause
        in the SK Hynix Agreement...............................................................................2

    C.     Dr. Lynde Engages in Improper Interpretation of the Supply Clause ........4

    D.     Opinion that the Hynix Agreement Is "Under a RAND Obligation" .........5

    E.     Dr. Lynde Assigns "above median importance" to the Patents-in-Suit
        Despite Claiming They Provide No Value ......................................................5

    F.     Comparability Analysis of the Goodman and ELM Licenses Is Improper...............6

II.    Dr. Lynde's Damages Analysis as to the '060 and '160 Patents ................................7

III.   References to RAND .................................................................................................9

IV.    Misstatement of RAND ............................................................................................9

V.     References to Undisclosed Alleged NIAs ...............................................................10

VI.    References to Alleged JEDEC Contributions ........................................................11

VII.   Discussions of Patent Hold-Up and Royalty Stacking ..........................................12

VIII.  References to Irrelevant Standards Setting Organizations......................................13

IX.    References to SSPPU................................................................................................14

X.     Dr. Lynde's Lump Sum, Through the Life of the Patents, Opinions ....................14

XI.    Dr. Lynde's Regression Analysis.............................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adv. Thermal Sci. Corp. v. App. Materials Inc.,*
   2009 WL 10671185 (C.D. Cal. July 20, 2009) ...................................................................4

*American Savings Bank, F.A. v. U.S.,*
   519 F.3d 1316 (Fed. Cir. 2008)............................................................................................3

*Apple Inc. v. Wi-LAN Inc.,*
   25 F.4th 960 (Fed. Cir. 2022) .........................................................................................1, 2

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,*
   65 F.3d 1406 (7th Cir. 1995)................................................................................................4

*Cell. Commc'ns Equip., LLC v. Apple Inc.,*
   2016 WL 6884660 (E.D. Tex. Sept. 2, 2016) ...................................................................15

*CSIRO v. Cisco Sys., Inc.,*
   809 F.3d 1295 (Fed. Cir. 2015)..........................................................................................13

*Ericsson, Inc. v. D-Link Sys., Inc.,*
   773 F.3d 1201 (Fed. Cir. 2014).......................................................................................2, 8

*Fromson v. W. Litho Plate & Supply Co.,*
   853 F.2d 1568 (Fed. Cir. 1988)............................................................................................7

*JP Morgan Chase Bank, N.A. v. DataTreasury Corp.,*
   823 F.3d 1006 (5th Cir. 2016) .............................................................................................3

*Kona Tech. Corp. v. S. Pac. Transp. Co.,*
   225 F.3d 595 (5th Cir. 2000)................................................................................................3

*LaserDynamics, Inc. v. Quanta Computer, Inc.,*
   694 F.3d 51 (Fed. Cir. 2012) ...............................................................................................6

*Microsoft v. Motorola,*
   2013 WL 2111217 (W.D. Wash. Apr. 25, 2013)................................................................2

*Nanology Alpha LLC v. WTTec Wissenschaftliche Instrumente*
   *und TechnologieGMbH,* 2018 WL 4289342 (E.D. Tex. July 11, 2018................................10

*Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc.,*
   2017 WL 4173467 (E.D. Tex. Sept. 21, 2017) ..................................................................13

*Optis Wireless v. Apple Inc.,*
   No. 2:19-cv-066-JRG, Dkt. 437 ........................................................................................12

**Page**

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010)................................................................................................2

**Other Authorities**

Rule 26(a)(2)(B)(ii) ...............................................................................................................15

I.      **Dr. Lynde's Comparable License Analysis**

A.      **Dr. Lynde Assigns the Same Value to Every Patent**

<u>Paragraphs 224-247, 265-285.</u>[1]  Dr. Lynde's damages analysis treats every patent in allegedly comparable portfolio agreements he relies on as equal in value.  He then divides the number of patents licensed by the cash consideration in the agreements to arrive at a per patent amount.  The Federal Circuit has provided detailed guidance on how portfolio agreements can be used to calculate rates for patent infringement damages.  In *Wi-LAN*, the Federal Circuit rejected expert opinion that the asserted '757 and '145 patents were key patents covered by the comparable licenses in that case. *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 973-74 (Fed. Cir. 2022). The Federal Circuit pointed to the fact that (1) "all three licenses were obtained prior to any litigation" involving the '757 and '145 patents; and (2) "those licenses treated the asserted patents as chaff, not wheat." *Id.* at 973. The licenses divided the licensed patents between two categories: Asserted Patents and Non-Asserted Patents—no license listed the '757 patent as an asserted patent, and only one listed the patent at all "in a schedule listing hundreds of Non-Asserted Patents." *Id.* Two of the licenses did not list the '145 patent as an "Asserted Patent," and for the third, the '145 patent was one of six Asserted Patents, with no evidence as to how the other Asserted Patents drove value in the license. *Id.* The Federal Circuit also identified that there was no evidence either patent was discussed in negotiations for two agreements. *Id.* For these reasons, the conclusion that the '757 and '145 drove the value of the licenses was not tethered to the facts.

Dr. Lynde's analysis looks at four licenses, and treats each family of patents included in these agreements as equal in value.  For example, in comparing the hypothetical negotiation to the SK Hynix agreement and the Rambus agreement, Dr. Lynde opines (Ex. 1, ¶ 273):

███████████████████████████████████████████████████

---

[1] Netlist's motion includes the schedules and workpapers cited in the disputed paragraphs.



Just as in *Wi-LAN*, the defect in his analysis goes to reliability. For example, the Hynix agreement

Dr. Lynde treats all Netlist patents as having equal value. He then applies his derived "all patents equal" royalty rate to this case, despite the fact that none of the identified ████████████████ are asserted here.  Micron will say this is fodder for cross-examination.  This is exactly what the Federal Circuit rejected in *Wi-LAN*.

It is also improper to calculate a per-patent license value by simply dividing a royalty amount by the number of patents, as it cannot be squared with the Federal Circuit's "requirement [] that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *see also ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("Any evidence unrelated to the claimed invention does not support compensation for infringement."). The court in *Microsoft v. Motorola* rejected determination of a RAND royalty via indiscriminate division of a patent pool rate by the number of patents because "patent pools do not use an incremental value approach, an approach that is required in the court's hypothetical negotiation paradigm." 2013 WL 2111217, at *80 (W.D. Wash. Apr. 25, 2013).

**B.    Dr. Lynde Provides an Improper Legal Interpretation of the MFL Clause in the SK Hynix Agreement**

Paragraphs 128-130, 141-145, 233, 239.  The SK Hynix Strategic Product Supply and License Agreement (the "SPSLA") ███████████████.



Dr. Lynde engages in what can only be described as contract interpretation, claiming that this clause allows him to conclude that: ███████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ For example, he argues:



He also argues: ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████ *Id.* at ¶ 142. The interpretation of ████████████████ is a purely legal issue for the Court. *Kona*

*Tech. Corp. v. S. Pac. Transp. Co.,* 225 F.3d 595, 609-10 (5th Cir. 2000).

██████████████████████████████████ means that there was no other consideration

provided in the agreement other than cash consideration has no basis in contract law. *American*

*Savings Bank, F.A. v. U.S.,* 519 F.3d 1316, 1324 (Fed. Cir. 2008) ("[T]here is a 'presumption that

when parties enter into a contract, each and every term and condition is in consideration of all

the others, unless otherwise stated.'").  Likewise, ██████████████████████ limits the

ability of Netlist to grant subsequent licenses is also a pure issue of law.  And Courts have

consistently rejected this theory. *See, e.g., JP Morgan Chase Bank, N.A. v. DataTreasury Corp.,* 823

F.3d 1006, 1009 (5th Cir. 2016) (quoting licensing provision, "[i]f DTC grants to any other Person

a license to any of the Licensed Patents, it will so notify JPMC, and JPMC will be entitled to the benefit of any and all more favorable terms with respect to such Licensed Patents."); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (MFNs "are standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers" and do not constitute "price fixing").

### C.   Dr. Lynde Engages in Improper Interpretation of the Supply Clause

<u>Paragraphs 147, 236-239</u>.  The SK hynix Agreement contains a provision for a product supply agreement, wherein ██████████████████████████████████████████ ████████████████████████████.   The   obligation   is   binding: ██████████████████ ██████████████████████████████████████ Ex. 3 at 1. ████████████ ██████████████████████████████████████████████████ *Id.* at § 5.1. The contract also specifies only narrow circumstances in which ████████████████████████ ██:



The incorporated by reference Product Purchase and Supply Agreement (Ex. 3) also makes clear that SK hynix's obligation to supply is binding. It makes clear that ████████████████ ████████████████████████████ *Id.* at § 2.1. Shall is language of obligation. Under the law of California, which governs, this represents a binding supply obligation. *Adv. Thermal Sci. Corp. v. App. Materials Inc.*, 2009 WL 10671185, at *4 (C.D. Cal. July 20, 2009) (finding contract language "Upon [AMI's] request, [ATS] shall supply and sell to [AMI] Components" was reasonably susceptible to interpretation as "an affirmative supply obligation.").

Dr. Lynde opines that ████████████████████████████████████████ ████████████████████████████████████████████████████████████

███████████  Ex. 1 at ¶ 237.  The interpretation that the supply clauses are not enforceable and do nothing more than recite the process that any customer can go through is a purely legal question for the Court.  The Court should hold, as it did in *Samsung*, that the clause is enforceable. 2:21-cv-00463, Dkt. 432 (granting MIL to "Preclude Samsung from Presenting any evidence or argument that SK hynix's supply obligation to Netlist is not legal[ly] binding on SK hynix.").

### D.  Opinion that the Hynix Agreement Is "Under a RAND Obligation"

Paragraph 249.  Dr. Lynde claims in Paragraph 249 that the SK Hynix Agreement is "under a RAND obligation."[2]  He does not identify what Standards Setting Organization (SSO) triggers this RAND obligation.  But it is presumed he is referring to JEDEC.  Under JEDEC standards, a RAND obligation only exists if a patent claim meets strict criteria.  Ex. 4 (JM21) at § 8.2.4 ("RAND Patent Licensing Commitment. Subject to the terms and conditions of section 8.2.4, each Committee Member, as a condition of Participation, agrees to offer to license on RAND terms, to all Potential Licensees, such Committee Member's Essential Patent Claims for the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC Standard issued during the period of membership in that committee.").  The Hynix Agreement does not state anywhere on its face that it is under a RAND obligation.  It does not state anywhere that any of the Netlist Licensed Patents meet the JEDEC definition of Essential Patent Claims.  Micron does not contend in this litigation that any of the Netlist Licensed Patents meet the JEDEC definition of Essential Patent Claims.  Micron experts do not analyze any of the patents licensed under the Hynix Agreement that were asserted against SK hynix and which led to the settlement and conclude that they meet the JEDEC standards for a RAND obligation.

### E.  Dr. Lynde Assigns "above median importance" to the Patents-in-Suit

---

[2] As explained below, Dr. Lynde's RAND opinions should be stricken from his report.

**Despite Claiming They Provide No Value**

Paragraphs 274, 276-279, 284.  In his report, Dr. Lynde opines that the patents-in-suit provide no incremental benefits to the Accused Products and have no actual technical value. Despite this, Dr. Lynde adjusts his proposed reasonable royalty based on the value of the patents:

He claims this is solely an "illustrative" adjustment, ¶ 274, but that is not correct.  Dr. Lynde **only** offers reasonable royalty opinions that apply this "adjustment factor," and does not offer any opinions that do not.  *E.g.*, Ex. 2 at Rebuttal Schedule 13A-D.  He applies this same "greater importance of the patents-in-suit" adjustment to his analysis of the other agreements as well. *See* Ex. 2 at Rebuttal Schedules 11A-D, Workpaper D (Goodman license), Workpaper C (ELM 3DS license).  The Federal Circuit prohibits numbers "plucked out of thin air" masquerading as quantitative damages analysis, even if they are allegedly "conservative" adjustments. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) (such "arbitrariness" "would alone justify excluding [expert]'s opinions").  Dr. Lynde cannot possibly present this opinion to the jury that he himself does not believe is true.

**F.     Comparability Analysis of the Goodman and ELM Licenses Is Improper**

Paragraphs 244-245.  This Court has entered MILs preventing parties from "introducing evidence, testimony, or argument concerning any party's overall financial size, wealth, or executive compensation," and "evidence, testimony, or argument referring to any other person or entity in disparaging ways."  Micron has tried an end-run around these MILs by having Dr. Lynde use the size of Netlist as a basis to assess economic comparability.  Dr. Lynde claims that the "Goodman" license is comparable.  Dr. Lynde opines that



Ex. 1 at ¶ 245.  Dr. Lynde's attempt to punish Netlist for being a small manufacturer (relative to Micron) runs directly contrary to Federal Circuit authority.  *Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988):

> The right to exclude conferred by a valid patent thus deserves the same respect when that right is in the hands of an individual as when it is in the hands of a corporation. In applying the methodology, emphasis on an individual inventor's lack of money and manufacturing capacity can tend to distinguish the respect due the patent rights of impecunious individual inventors from that due the patent rights of well-funded, well-lawyered, large manufacturing corporations. Any such distinction should be rejected as the disservice it is to the public interest in technological advancement. That "survival of the fittest" jungle mentality was intended to be replaced, not served, by the law.

If Dr. Lynde wants to argue this agreement is comparable, he may do so, but not by reference to what he believes is the small size of Netlist.

Dr. Lynde's analysis of the ELM 3DS agreement is similarly prejudicial and improper. Dr. Lynde uses that agreement to compare Netlist to an NPE: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 1 at ¶ 244.  There is also an independent basis for non-comparability, as Dr. Lynde has no reason to claim that the ELM 3DS license includes the Accused Products in this litigation, given that the agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and Micron's corporate representative identified no Micron products that infringe.  Ex. 5 (Westergard) at 91:17-20.

## II.   Dr. Lynde's Damages Analysis as to the '060 and '160 Patents

<u>Paragraphs 213–285</u>.  Dr. Lynde admits that the proper determination of a reasonable royalty in this case involves the hypothetical negotiation construct under the *Georgia-Pacific* factors. Ex. 1 at ¶¶ 213-218.  He applies what he describes as a "modified *Georgia-Pacific* analysis" due to the alleged RAND obligations on the '918 and '054 patents.  He also applies this same "modified

*Georgia-Pacific* analysis" to the '060 and '160 patents  Dr. Lynde explains his "modified *Georgia-Pacific* analysis" as follows: ███████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████  ██████████████████

████████████████████████████████  *Id.* at ¶ 248.  As discussed below, this is an incorrect description of the law and it should be stricken.  But Dr. Lynde does apply the Federal Circuit's decision in *Ericsson*, and ignores a number of the Georgia-Pacific factors in his "modified *Georgia-Pacific* analysis."  This creates a serious legal defect when he applies his analysis to the '060 and '160 patents, because both parties agree that no RAND obligation applies to the '060 and '160 patents.  In effect, what he has done is omitted consideration of *Georgia-Pacific* factors for the '060 and '160 patent.  The Federal Circuit has never affirmed an expert opinion that arbitrarily decides to ignore certain *Georgia-Pacific* factors in this manner.

Micron's technical expert does not opine the '060 and '160 patents are essential. Moreover, Dr. Lynde opines in his report that ████████████████████████████ ████████████████████████████████████████████████████████ Ex. 1 at ¶ 34, but does ***not*** make the same statement for the '060 and '160 patents.  *See Id.* ¶¶ 35-37.  In fact, Dr. Lynde does not claim there is a RAND commitment or obligation for the '060 and '160 patents anywhere in his report.  Dr. Lynde's analysis of *Georgia-Pacific* views every factor through a RAND rubric.  *E.g.*, Ex. 1 at ¶ 250 ██████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████  ; ¶ 252 ██████████████████████████████████████████  For these reasons, paragraphs 213 through 285 of Dr. Lynde's report should be stricken as they pertain to the '060 and '160 patents.

## III.     References to RAND

Paragraphs 31, 34, 47-65, 104-112, 213-285.  Throughout Dr. Lynde's report, he claims that two of the patents-in-suit (the '918 and the '054) are subject to a "RAND" obligation that entitles Micron to a RAND license. *See, e.g.,* Ex. 1 at ¶¶ 31, 34. This is incorrect as a matter of law. As discussed above, a JEDEC RAND obligation only exists if the asserted claims are Essential Patent Claims.  As explained in Netlist's MSJ That The Asserted Patents Are Not Standard-Essential, filed concurrently, there is no genuine dispute that any of the asserted claims meet the definition of essentiality in the JEDEC Patent Policy.  Micron wants to have it both ways: it wants to tell the jury that it does not infringe the patents-in-suit, but also that Micron is entitled to a RAND license because Netlist is asserting "Essential Patent Claims." This is confusing, prejudicial, and contradictory, and will necessitate a sideshow on essentiality that neither side plans to address. Netlist's experts will not argue that the patents are essential and thus infringed by any entity practicing the standard. Netlist will show on an element-by-element basis why Micron's specific accused designs infringe. In other words, the jury will not make a determination of whether the patents-in-suit are essential or not essential; the jury will only determine whether Micron infringes and how much Micron owes in damages for its infringement.

## IV.     Misstatement of RAND

Paragraph 248. Dr. Lynde makes the following statement:



The Federal Circuit has never held that a RAND obligation results in a "lower royalty." A RAND obligation results in different factors that can be considered under the *Georgia-Pacific* analysis.  If the jury receives a RAND instruction, it will not be instructed that RAND results in

a lower royalty rate and it is improper for Dr. Lynde to be instructing the jury on the law.

**V.      References to Undisclosed Alleged NIAs**

Paragraphs 77, 79, 257-58.  Dr. Lynde identifies an alleged NIA to the '918 and '054 Patents that impacts his reasonable royalty analysis, based on an alleged conversation with Micron's technical expert Dr. Stone.  *See* Ex. 1 at ¶ 77.  Netlist served an interrogatory asking Micron to identify any alleged non-infringing alternatives ("NIAs"). Ex. 6 (Micron Interrogatory Responses), at 120-121. For the accused HBM products, Micron identified "the hybrid memory cube as a noninfringing alternative." *Id.* at 123.  For the accused DDR5 products, Micron identified **no** alleged NIAs whatsoever.  *See id.* at 122-23. Dr. Lynde (and Dr. Stone) have now supplied, after fact discovery, new NIAs they claim should be taken into account when calculating damages.  The prejudice to Netlist is real, because Netlist is unable to examine Micron's fact witnesses on the viability of these newly-imagined NIAs.

Courts in this district routinely strike non-infringing alternatives that are not disclosed during the fact discovery period and are only disclosed for the first time in rebuttal reports. *See, e.g., Nanology Alpha LLC v. WITec Wissenschaftliche Instrumente und Technologie GMbH*, 2018 WL 4289342, at *5 (E.D. Tex. July 11, 2018) ("the Court finds that WITec's failure to disclose these alternatives until after the close of fact discovery would significantly prejudice Plaintiff and is not substantially justified.").  In *Nanology*, the court held that "WITec's failure to disclose these alternatives until after the close of fact discovery would significantly prejudice Plaintiff and is not substantially justified." *Id.* at *5. The court also held "the importance of the alternatives is minimal," as the expert did not explain "how the [NIAs] are non-infringing, or provide any information on the cost or availability of these alternatives." *Id.* Here too, Dr. Lynde does not explain how any of the NIAs are non-infringing, or provide any information on the cost or availability. Dr. Lynde's discussions of undisclosed NIAs should be stricken from his report.

## VI.     References to Alleged JEDEC Contributions

Paragraphs 86-87, 53. Dr. Lynde refers to the "contributions" to JEDEC standards by various members of JEDEC. Ex. 1 at ¶ 86 ████████████████████████████ ███████████████████████████████████████████ Dr. Lynde purports that these contributions demonstrate the low value of the patents-in-suit. *Id.* at ¶ 87 ████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████

But neither Dr. Lynde, nor Mr. Halbert upon whom he relies for these statements, identifies any nexus between the thousands of contributions they claim have been contributed to JEDEC standards and the specific technology accused in this case. Indeed, both Dr. Lynde and Mr. Halbert identify alleged contributions to "HBM2/3/4" standards. *Id.* ¶ 87.  Neither party contends that the '060 or '160 patents are essential to any standard.  Nor does Dr. Lynde (or Mr. Halbert) identify the technical value of any of these contributions, or whether any of these contributions actually added anything of economic value to the standards. Dr. Lynde states that ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████ *Id.* at ¶ 86. There is no relevance to this statement and no connection to the patented technology in this case.

The Court has explained previously that where there is reference to thousands of contributions or patents to a particular standard, but there is no ████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████ *Optis Wireless v. Apple Inc.*, No. 2:19-cv-066-JRG, Dkt. 437 (Pretrial Hearing) at 89:3-24.

## VII.   Discussions of Patent Hold-Up and Royalty Stacking

<u>Paragraphs 47-65, 106, 111, 222, 257</u>.  Dr. Lynde's report includes multiple paragraphs discussing the issues of patent "hold up" and "royalty stacking."  For example, Dr. Lynde opines that ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████  Ex. 1 ¶ 111; *see also* ¶ 53

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████  These discussions should be stricken from Dr. Lynde's report.  First, Dr. Lynde's opinions are tied to the RAND obligation.  As discussed above, neither party contends that the patents-in-suit are SEPs, and as such there is no RAND obligation.  Thus, Dr. Lynde's opinions are irrelevant and should be stricken.

Second, Micron has not brought any claims of hold-up or royalty stacking in this case. Netlist sent Micron an interrogatory asking Micron to "Set Forth the Complete Basis for Your position regarding the theories, amounts, and methods of calculating the damages to which Netlist will be entitled if Micron is found to infringe each Asserted Patent […]." Ex. 6 (Micron's Interrogatory Responses) at 174. The phrases "patent hold-up" and "royalty stacking" do not appear anywhere in Micron's response to any interrogatories (nor do the general concepts of hold-up or royalty stacking). Ex. 6 at 174-76.  By failing to identify these issues anywhere in discovery, and not until rebuttal reports, Micron prevented Netlist from analyzing the issue.

Dr. Lynde's opinions should also be stricken because they are not tied to the facts of this case.  Dr. Lynde provides nothing more than a vague assertion that hold-up and stacking could

exist, but does not identify any actual instances of either.  For example, Dr. Lynde has not analyzed how many actually-essential patents there are with relation to any of the standards he claims are relevant in this case.  The Federal Circuit rejects assertions of royalty stacking that are not connected to the facts of the case. *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1302 (Fed. Cir. 2015) ("abstract recitations of royalty stacking theory, and qualitative testimony that an invention is valuable—without being anchored to a quantitative market valuation—are insufficiently reliable.").  Moreover, where a defendant "has not presented evidence suggesting that [the patent owner] actually uses its SEP's to extract higher royalties from standard-compliant entities, i.e., engages in patent holdup," patent hold-up opinions should be excluded. *Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc.*, 2017 WL 4173467, at *7 (E.D. Tex. Sept. 21, 2017) (citing *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1218 (Fed. Cir. 2014)) (excluding holdup opinions where expert failed to show actual complaints against the patentee).  Dr. Lynde does not contend that any entity has ever, before Dr. Lynde's report, complained that Netlist is partaking in hold-up.

## VIII.   References to Irrelevant Standards Setting Organizations

Paragraphs 10, 47-65, 88.  Throughout his report, Dr. Lynde discusses standards setting organizations (SSOs) other than JEDEC, including ETSI and IEEE, and also discusses SSOs generally.  He does this as a purported explanation of how SSOs work generally, how RAND obligations work generally, and as part of his abstract discussions of hold-up and stacking.  *See, e.g.*, Ex. 1 at ¶ 54 ███████████████████████████████████████

██████████████████████████████████████████████████████

██████████████ (citing ETSI Rules of Procedure).  The rules and procedures of other SSOs have nothing to do with JEDEC or the patents in this case.  Allowing these opinions into the case would lead to a sideshow regarding those SSOs, the purpose of their IPR policies, and the different requirements of various SSOs.  For example, the jury would need to be told that the

purpose of the ETSI IPR Policy is to ensure that "members are fully entitled to hold and benefit from any [intellectual property rights] which they may own, including the right to refuse the granting of licenses." Ex. 7 (ETSI Guide on IPRs) at 1.1.  The jury would also need to know that Dr. Lynde's opinion that the reasonable royalty should be calculated in a particular manner due to the existence of SSOs and a RAND obligation has been rejected by ETSI, which sets out that "specific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI." *Id.* at 4.1.

**IX.      References to SSPPU**

Paragraphs 88-90, 262, 266.  Dr. Lynde's report purports to put forward an "SSPPU Analysis" to "limit the damages base" in this case.  These discussions should be stricken from his report.  As discussed above, Netlist served interrogatories on Micron relating to its damages analysis.  At no point during discovery did Micron ever identify the theory that damages should be limited to an SSPPU that is different than the accused products.  By disclosing damages positions, but not this specific theory, it prevented Netlist's experts from addressing this issue.

**X.      Dr. Lynde's Lump Sum, Through the Life of the Patents, Opinions**

Paragraph 254. Dr. Lynde claims in his analysis of *Georgia-Pacific* Factor 7 that



Ex. 1 at ¶ 254.  But Dr. Lynde only proposes a reasonable royalty for sales through trial.  *See* ¶ 280

Dr. Lynde similarly only proposes a reasonable royalty "through trial" in his supporting "schedules" to his report.  *See, e.g.*, Ex. 2 at Rebuttal Schedule 12

The only reasonable royalty opinion Dr. Lynde has put forward is based on a per-unit sales royalty through trial; there would be no basis for Dr. Lynde

to tell the jury that the term of the license runs through 2033.

In addition, although discussed nowhere in the body of his report, in his "workpapers" Dr. Lynde proposes a "full term" lump sum royalty payment for the patents-in-suit based on the ██████████████████████████████████████ *See* Ex. 2, Sch. 11 Workpapers C and D:

███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████

Dr. Lynde provided no data on how he calculated these numbers, where his post-trial unit numbers came from, or anything that would allow this calculation to be tested. Nor does Dr. Lynde opine in his report that calculating a lump sum royalty in this manner is appropriate, or that the parties would do so at the hypothetical negotiation.

## XI.  Dr. Lynde's Regression Analysis

Paragraphs 91-103. Dr. Lynde purports to have run his own regression analysis as a "correction" to Netlist's regression expert Dr. Groehn's regression. *E.g.*, Ex. 1 at ¶ 95. Micron and Dr. Lynde have refused to produce Dr. Lynde's alleged regression model and underlying programming. Micron served Dr. Lynde's report on October 30. Netlist's counsel reached out to Micron on November 2 asking them to provide Dr. Lynde's programming code. Micron's counsel ignored that email. Netlist's counsel reached out again on November 3: "[p]roduce the programming code of Dr. Lynde in connection with the rebuttal report (this should have been produced with his expert report on Oct. 30; Netlist reserves all rights, including moving to strike corresponding portions of Dr. Lynde's expert report." Ex. 8 (Tezyan Email Nov. 3). Micron again refused to respond. This is a direct violation of Rule 26(a)(2)(B)(ii), requiring the production of "the facts or data considered by the witness" in forming his opinion. *See Cell. Commc'ns Equip., LLC v. Apple Inc.*, 2016 WL 6884660, at *2-*3 (E.D. Tex. Sept. 2, 2016) (striking portions of expert report "that rely on undisclosed testing data"). For these reasons, the Court should strike Dr. Lynde's regression opinions.

Dated: November 14, 2023

Respectfully submitted,

/s/ *Jason G. Sheasby*
Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Jason G. Sheasby (*pro hac vice*)
jsheasby@irell.com
Annita Zhong, Ph.D. (*pro hac vice*)
hzhong@irell.com
Andrew J. Strabone (*pro hac vice*)
astrabone@irell.com
Thomas C. Werner (*pro hac vice*)
twerner@irell.com
Yanan Zhao (*pro hac vice*)
yzhao@irell.com
Michael W. Tezyan (*pro hac vice*)
mtezyan@irell.com

**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199

***Attorneys for Plaintiff Netlist, Inc.***

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I hereby certify that the foregoing document and exhibits attached hereto are authorized to be filed under seal pursuant to the Protective Order entered in this Case.

*/s/ Yanan Zhao*
Yanan Zhao

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 14, 2023, a copy of the foregoing was served to all counsel of record via Email as agreed by the parties.

*/s/ Yanan Zhao*
Yanan Zhao

**CERTIFICATE OF CONFERENCE**

I hereby certify that, on November 14, 2023, counsel for Netlist met and conferred with Micron's counsel regarding the subject matter of Netlist's motion.  Micron opposes Netlist's motion.

*/s/ Yanan Zhao*
Yanan Zhao