# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

NETLIST, INC.,                    (   CAUSE NO. 2:21-CV-463-JRG
                                  )
         Plaintiff,               (
                                  )
vs.                               (
                                  )
SAMSUNG ELECTRONICS CO., LTD.,    (
et al.,                           )   MARSHALL, TEXAS
                                  (   APRIL 18, 2023
         Defendants.              )   8:30 A.M.
_____



VOLUME 3


_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury
_____









SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

1    customer?

2    A.    Yes.

3    Q.    Did you do all of this work yourself -- actually, you

4    mentioned a moment ago that you had some help from a team.

5    Could you tell us a little bit more about the team?

6    A.    Sure.  I've got a team that consists generally on -- on

7    big matters like this of six key people with a number of staff

8    that work on those six sub-teams and that all have specialized

9    experience in particular areas of patent valuation and

10   economic analysis.

11   Q.    And can you give us an example of why you call upon your

12   colleagues for some of the advanced work involving software?

13   A.    Sure.  One example is we'll talk about a regression

14   analysis later of the massive amount of sales data, and

15   there's an economist that works with me, that that's what he

16   does for a living.

17        And so I worked with him or -- and he worked with me to

18   analyze the sales data that Samsung had produced in this

19   matter, because we had to determine what was sold, how much it

20   was sold for, and the relationship between the sales prices

21   and the speed, which we'll talk about later.

22   Q.    Okay.  Before we get into the details of your analysis,

23   is there a United States law that you followed for your work

24   in this case?

25   A.    Yes, patent damages statute.

1   Q.   We have that on the screen.  Could you explain for us how

2   that influences your analysis?

3   A.   The important aspect of this is that Samsung should pay

4   in no event less than a reasonable royalty for the use made of

5   the invention.  That's what I'm determining, the value of that

6   use, how much they used it, and what they made off of that

7   use.

8   Q.   Is there a framework that damages experts such as

9   yourself typically use to evaluate royalties?

10  A.   Yes.  It's called a hypothetical negotiation.

11  Q.   What are the rules that apply to this hypothetical

12  negotiation that we do in -- in litigation?

13  A.   So there's three important rules.  The first one there is

14  that the parties have to reach an agreement.  They can't walk

15  away like you can do in the real world.

16       And, second, you have both parties have access to all --

17  each other's information, even confidential top secret

18  information that you don't get in the real world negotiating.

19       And then the third important factor is that in this

20  hypothetical negotiation, Samsung knows that Netlist's patents

21  are valid and infringed.

22  Q.   When does the hypothetical negotiation take place for

23  this case?

24  A.   It's at the date of first infringement.  And for the HBM

25  products, that's July of 2020 after the JDLA ended.  And for

1    DDR4 and DDR5, it was March and May of 2021.

2    Q.   And just to level-set on that, you were here in Court,

3    Mr. Kennedy, when Judge Gilstrap explained to the jury that it

4    had been determined that Samsung no longer had a license after

5    July of 2020.  Is that where that date is coming from?

6    A.   Yes, that's correct.

7    Q.   Now, is there a set of factors that courts have laid out

8    to aid experts like yourself in performing this analysis?

9    A.   Yes.  They're called the *Georgia-Pacific* factors, named

10   after a well-known patent case years ago, and it outlines 15

11   factors that experts need to consider to determine damages.

12   Q.   What are the first three factors that you focused on for

13   your work?

14   A.   So 1 and 2 relate to any licensing history that the

15   parties might have that might be relevant to the hypothetical

16   negotiation.

17        And factor No. 5 is something where we have to consider

18   the commercial relationship between the licensor and licensee

19   at the time of this hypothetical negotiation.

20   Q.   Mr. Kennedy, when you reviewed all of the facts and

21   documents in the case, what did you find to be the most

22   significant facts regarding the parties' licensing history and

23   their relationship?

24   A.   Well, Netlist has never licensed its patents outside of a

25   strategic agreement, and that's really important because in

1    the hypothetical negotiation there is no strategic agreement.

2    Samsung needs a license to the patents, and they are not

3    giving anything in return for that except royalties.

4    Q.    And could you go on and describe what other additional

5    significant facts you found?

6    A.    So the JDLA included a cross license, and that means that

7    Netlist got a license to all of Samsung's patents, and they

8    also got this highly valuable supply agreement.

9    Q.    And -- I'm sorry.  Go on, Mr. Kennedy.

10   A.    Sure.  And one other factor that I considered was the

11   fact that Samsung entered into a license in a very similar

12   situation as this situation, and it involved memory patents

13   and they agreed to pay up to $1.1 billion plus give a cross

14   license to Rambus to their patents.

15   Q.    So at a high level, what was the impact of these on how

16   you're thinking about the parties approaching a hypothetical

17   negotiation?

18   A.    So these are all important factors that place upward

19   adjustment on the royalty rate, significant upward adjustment.

20   Q.    So let's turn to each of them in turn.  You mentioned

21   that Netlist never previously has licensed or never in the

22   real world has licensed its patents outside of a strategic

23   relationship.  What was significant to you in particular about

24   the JDLA relationship?

25   A.    So this is some deposition testimony from Samsung's

1  president of memory, and he was told to look into any

2  feasibility of a technological collaboration with Netlist.

3  And that's significant because Samsung is the largest memory

4  company in the world, and they're coming to Netlist for help

5  to this technology.  So that would definitely have a

6  significant upward adjustment to the royalty rate at the

7  hypothetical negotiation.  Samsung really needs Netlist

8  technology.

9  Q.   Now, did you see evidence that Samsung was aware that

10  Netlist had important patents?

11  A.   Yes, I did.

12  Q.   Now, I know the jury has seen these a number of times.

13  Are these some of the examples on the screen here of the

14  evidence that Samsung was aware of the Netlist patents and

15  pending applications?

16  A.   Yes.

17  Q.   Now, you mentioned that the JDLA included, I think you

18  used the phrase, a highly valuable supply obligation.  Is that

19  right?

20  A.   Yes.

21  Q.   And were you able to review the records of the parties to

22  understand the quantities of supply that were exchanged when

23  the JDLA was first put in place?

24  A.   Yes, I was.

25  Q.   And what is the particular example that we're looking at

1          THE COURT:  All right.  Let me see Mr. Cordell,

2    Mr. McKeon, and Ms. Smith, together with Mr. Sheasby,

3    Mr. Burgess, and Ms. Truelove in chambers.

4        Otherwise, we stand in recess until tomorrow morning.

5            (The proceedings were concluded at 5:30 p.m.)